## HEAD MONEY CASES.

### EDYE and Another *v.* ROBERTSON, Collector.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

### CUNARD STEAMSHIP COMPANY *v.* SAME.

### SAME *v.* SAME.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued November 19, 20, 1884.—Decided December 8, 1884.

The act of Congress of August 3, 1882, "to regulate immigration," which im-poses upon the owners of steam or sailing vessels who shall bring passen-gers from a foreign port into a port of the United States, a duty of fifty

cents for every such passenger not a citizen of this country, is a valid exercise of the power to regulate commerce with foreign nations.

Though the previous cases in this court on that subject related to State statutes only, they held those statutes void, on the ground that authority to enact them was vested exclusively in Congress by the Constitution, and necessarily decided that when Congress did pass such a statute, which it has done in this case, it would be valid.

The contribution levied on the shipowner by this statute, is designed to mitigate the evils incident to immigration from abroad, by raising a fund for that purpose; and it is not, in the sense of the Constitution, a tax subject to the limitations imposed by that instrument on the general taxing power of Congress.

A tax is uniform, within the meaning of the constitutional provision on that subject, when it operates with the same effect in all places where the subject of it is found, and is not wanting in such uniformity because the thing taxed is not equally distributed in all parts of the United States.

A treaty is primarily a compact between independent nations, and depends for the enforcement of its provisions on the honor and the interest of the governments which are parties to it. If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them. With this, judicial courts have nothing to do.

But a treaty may also confer private rights on citizens or subjects of the contracting powers which are of a nature to be enforced in a court of justice, and which, in cases otherwise cognizable in such courts, furnish rules of decision. The Constitution of the United States makes the treaty, while in force, a part of the supreme law of the land in all courts where such rights are to be tried.

But in this respect, so far as the provisions of a treaty can become the subject of judicial cognizance in the courts of the country, they are subject to such acts as Congress may pass for their enforcement, modification, or repeal.

These suits were brought to recover back sums collected at various times as duties on immigrants arriving in the United States, under the provision of the act of August 3, 1882, 23 Stat. 214, "that there shall be levied, collected, and paid a duty of fifty cents for each and every passenger not a citizen of the United States, who shall come by steam or sail vessel from a foreign port to any port within the United States." Protests were filed against each payment, and all other steps required as foundations for the actions were taken. In the Edye Case there was a trial, jury being waived, a finding of facts, a judgment, and exceptions. 18 Fed. Rep. 135. In the Cunard Cases judgment was entered in favor of the collector

on demurrer to the complaints. The causes were brought here on writs of error.

*Mr. George DeForest Lord* for Cunard Steamship Company. —The act imposes two classes of duties on the Secretary. 1st. With regard to convicts, &c. 2d. With regard to emigrants. The money when collected is to be applied to the needs of such of the second class as arrive in steam or sail vessels, in each case being spent only at the port where raised. The power for such legislation must be found, if at all in the grant, either of power to levy taxes, &c., or of power to regulate commerce. The grant of power to levy taxes indicates the purposes for which the money raised shall be used. Whether construed literally or strictly, all agree that it must be expended for general welfare. If the money raised is to be used for the benefit of a few individuals, in a limited locality, the act authorizing it to be raised is not within the constitutional grant of power to levy taxes. As to the power to regulate commerce, &c., the following propositions may be taken as settled. 1. Commerce includes navigation as well as traffic, and extends to the transportation of passengers equally with merchandise. *Gibbons* v. *Ogden*, 9 Wheat. 1; *The Passenger Cases*, 7 How. 283; *Henderson* v. *Mayor of New York*, 92 U. S. 259. 2. The power to regulate commerce includes a power to determine the conditions upon which it is to be carried on, to encourage, or even to entirely prohibit it, including of course every mode of "regulating" it which lies intermediate between those extremes. 3. The authorized regulation of commerce may be accomplished indirectly by the adjustment of the duties from which a national revenue is derived, as well as directly by positive enactments enforced by appropriate penalties. 4. But the commerce which Congress has power to regulate must be either "with foreign nations, or among the several States, or with the Indian tribes." Each transaction which goes to make up this commerce must have a beginning, and an end. The transactions embraced in foreign "commerce," have their beginning in the departure of persons or property from a foreign country, and end only when those persons become mingled

with the common inhabitants, and when the property becomes mingled with the mass of other property of the State to which they are severally brought. *Brown* v. *Maryland*, 12 Wheat. 419, 441; *Passenger Cases*, above cited; *United States* v. *Gould*, 8 Am. Law Reg. O. S. 525; *United States* v. *Haun*, 8 Am. Law Reg. O. S. 663. It cannot be maintained that the money required is a license fee; not only because it is styled in the act a " duty " and not a " license fee," but also because it is inconsistent with the idea of a license, being imposed, not for the purpose of regulating the traffic, but to raise money for particular expenditures. The " duty " imposed is not a regulation of commerce. The title of the act cannot make it a regulation of immigration. *People* v. *Compagnie Transatlantique*, 107 U. S. 59. The duty is not imposed in aid of those branches of the act which aim to regulate the immigration, but for the care and relief of the immigrant after the voyage is over, and landing effected. This use of the money is outside of the purposes for which power is conferred upon Congress to impose taxes for the regulation of commerce. It has indeed been decided that similar taxes imposed by the States interfere with the exclusive power given to Congress to regulate commerce. *Passenger Cases*, 7 How. 283; *Henderson* v. *Mayor*, above cited; *People* v. *Compagnie Transatlantique*, above cited. But it does not follow that Congress may, under its power to regulate commerce, tax to raise money for purposes not included within the taxing power. Nor can the act be sustained under the power to levy taxes to provide for the general welfare; because, in its scope and purpose it has nothing to do with the general welfare. Lastly, the Constitution requires that all duties shall be uniform throughout the United States, that is, that they shall be uniform in character, and that they shall apply uniformly. A tax is not uniform in character when it discriminates between individuals or classes engaged in the trade or profession taxed. Cooley on Taxation, 138; *Police Jury* v. *Nougues*, 11 La. Ann. 739; *Knowlton* v. *Rock County Supervisors*, 9 Wisc. 410. This law discriminates between those who carry on the business in vessels, and those who do so by rail or otherwise. The tax is not territo-

rially· uniform, because it discriminates against the seaboard
States.

Mr. *Edwards Pierrepont* and *Mr. Philip J. Joachimsen*
for Edye & Another.—Congress has no power to establish
eleemosynary and police regulations within the several States.
An emigrant, arriving at New York, becomes at once under
the protection of State laws. Emigration is not a "business"
to be regulated by federal law. It is the voluntary act of the
emigrant, and is completed the moment he arrives. After
again stating some of the objections presented by Mr. Lord,
counsel continued: The tax in question is either a tax on the
"person"·or a "duty" on a "commercial object." The court
below holds it to be "a tax on the owner of the vessel, made
a lien on his vessel, because he brings alien passengers in his
vessel. It is a tax on the business he carries on." The act of
Congress calls it "a duty"  .  .  .  for each and every pas-
senger not a citizen of the United States who shall come by
steam or sail vessel from a foreign port to any port within the
United States. The Secretary of the Treasury calls it a
"capitation tax." In his instructions of June 27, 1884, the
court below called it "head money." As head money or
capitation tax it is not laid according to the rule prescribed.
It is, undoubtedly, a direct personal tax. The prohibitory
language of the Constitution is as follows: "No capitation or
other direct tax shall be laid, unless in proportion to the
census."  .  .  .  This tax, according to the opinion below, is
not to be considered in the "sense" of a capitation tax. If not
to be held in that sense, it is embraced under the head of "or
other direct tax." That the tax is really on the person of the
passenger, and is not a mere license fee, is demonstrable. It is
to be paid by the owner or consignee for each and every pas-
senger. In *United States* v. *Railroad Co.*, 17 Wall. 322, a tax
nominally imposed on the railroad company was held to be a
tax on the bondholder or creditor,·and not on the corporation:
that the corporation was made use of as but a convenient
means of collecting the tax. In *Crandall* v. *State of Nevada*,
6 Wall. 35. this court held that a special tax on railroad and

stage companies for every passenger carried by them, is a tax on the passenger, . . . and is not a simple tax on the business of the companies. In *Henderson* v. *Mayor, &c., of New York*, 92 U. S. 259, this court held that a like tax, under a State statute is, in effect, a tax on the passenger. The imposition of head money on free men is contrary to the first principles of this government. It is void because levied upon or for the human body. It is in the record that the tonnage duty imposed by law on our vessels had been paid. That payment gave us the right to trade for all purposes whatever. The act also is in conflict with rights secured by treaties. In their brief the counsel cite the treaties with Belgium, of July 17, 1858; Denmark, April 26, 1826; Great Britain, November 19, 1794, July 3, 1815; Netherlands, October 8, 1782, August 8, 1852; Prussia, May 1, 1828; France, June 24, 1822; Sweden and Norway, July 4, 1827. *Taylor* v. *Morton*, 2 Curtis, 454, and *Cherokee Tobacco Case*, 11 Wall. 616, hold that a treaty obligation may be superseded by a statute. We point out that this court had no opportunity to pass upon the ruling in the first case, and that the second was decided by a divided court. See 1 Kent Com. 177; *United States* v. *Schooner Peggy*, 1 Cranch, 103; *The Chinese Merchants*, 13 Fed. Rep. 605; *United States* v. *Douglas*, 17 Fed. Rep. 634.

We claim that children, though brought in the ship, are not passengers. The term "passenger" is defined in the dictionary as follows: "*Passenger*. A traveller; one who is upon the road; a wayfarer; one who hires in any vehicle the liberty of travelling." These children, who are not *sui juris*—are not able to take care of themselves—cannot be said to be "travellers" or "wayfarers," or as being "upon the road," and certainly not persons who "hire in any vehicle the liberty of travelling," because they cannot make any contract of hiring. The tax is upon "passengers." The description of a "passenger," in a legal sense, as contradistinguished from the "person," is settled by the first, fourth and fifth sections of the Passenger Act of 1882, 22 Stat. p. 184; in section 4th it says: "Mothers with infants and young children shall be furnished the necessary quantity of wholesome milk, or condensed milk,

for the sustenance of the latter." In section 5th it provides that : " The service of a surgeon shall be promptly given to any of the passengers, or to any infant or young child of any such passengers, who may need his services." And in the first section of that act it is expressly provided that it shall not be lawful for the master of a steamship wherein emigrant passengers, or passengers other than cabin passengers, are brought into the United States, to bring such passengers, unless the compartments, &c., thereinafter mentioned, shall have been provided. Then, that for each and every passenger there shall be 100 cubic feet, or 120 cubic feet, according to the location; and that in computing the number of such passengers carried or brought in any vessel, children under one year of age shall not be included; and two children, between one and eight years of age, shall be counted as one passenger.

In contemporaneous acts on the same subject, a definition of a qualification in one, controls all others *in pari materia*.

*Mr. Solicitor General* for defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

These cases all involve the same questions of law, and have been argued before this court together.

The case at the head of the list presents all the facts in the form of an agreed statement signed by counsel, and it therefore brings the questions before us very fully. The other two were decided by the Circuit Court on demurrer to the declaration.

They will be disposed of here in one opinion, which will have reference to the case as made by the record in *Edye & Another* v. *Robertson*.

The suit is brought to recover from Robertson the sum of money received by him, as collector of the port of New York, from plaintiffs, on account of their landing in that port passengers from foreign ports, not citizens of the United States, at the rate of fifty cents for each of such passengers, under the act of Congress of August 3, 1882, entitled "An Act to regulate immigration."

The petition of plaintiffs and the agreed facts, which are

also made the finding of the court to which the case was submitted without a jury, are the same with regard to each of many arrivals of vessels of the plaintiffs, except as to the name of the vessel and the number and age of the passengers. The statement as to the arrival first named, which is here given, will be sufficient for them all, for the purposes of this opinion.

The following are admitted to be the facts in this action :

" I. That the plaintiffs are partners in trade in the city of New York under the firm name of Funch, Edye & Co., and carry on the business of transporting passengers and freight upon the high seas between Holland and the United States of America as consignees and agents.

" That on the 2d day of October, 1882, there arrived, consigned to the plaintiffs, the Dutch ship Leerdam, owned by certain citizens or subjects of the Kingdom of Holland, and belonging to the nationality of Holland, at the port of New York. She had sailed from the foreign port of Rotterdam, in Holland, bound to New York, and carried 382 persons not citizens of the United States.

" That among said 382 persons, 20 were severally under the age of one year, and 59 were severally between the ages of one year and eight years.

" That upon the arrival of said steamship Leerdam within the collection district of New York, the master thereof gave, in pursuance to section nine of the passenger act of 1882, and delivered to the custom-house officer, who first came on board the vessel and made demand therefor, a correct list, signed by the master, of all the passengers taken on board of said Leerdam at said Rotterdam, specifying separately the names of the cabin passengers, their age, sex, calling, and the country of which they are citizens, and also the name, age, sex, calling, and native country of each emigrant passenger or passengers other than cabin passengers, and their intended destination or location, and in all other respects complying with said ninth section, and a duplicate of the aforesaid list of passengers, verified by the oath of the master, was, with the manifest of the cargo, delivered by the master to the defendant as col-

lector of customs of the port of New York on the entry of said vessel.

"That it appears from the said list of passengers and duplicate that the said 382 persons were each and every one subjects of Holland or other foreign powers in treaty of peace, amity, and commerce with the United States.

"That the said passenger manifest also states the total number of passengers, and shows that 20 of them were under one year of age, and 59 between the ages of one year and eight years.

"That said collector, before allowing complete entry of said vessel, as collector decided, on the 12th day of October, 1882, that the plaintiffs must pay a duty of one hundred and ninety-one dollars for said passengers, being fifty cents for each of said 382 passengers.

"That by the regulations of the Treasury Department the non-payment of said 191 dollars would have permitted the defendant to refuse the complete entry of the vessel, or to refuse to give her a clearance from the port of New York to her home port, and such imposition would have created an apparent lien on said vessel for said sum of 191 dollars.

"On the defendants making such demand the plaintiffs paid the same and protested against the payment thereof.

"That a copy of the protest in regard to said Leerdam is annexed to the complaint, marked No. 1, and is a correct copy of the protest.

"That on the same day the plaintiffs duly appealed to the Secretary of the Treasury from such decision of the collector, and that the paper marked Appeal No. 2, annexed to the complaint, is a copy of said appeal.

"On the 18th of October, 1882, the Secretary of the Treasury sustained the action of the defendant, and this action is brought within ninety days after the rendering of such decision.

"That the payment set forth in the complaint herein was levied and collected by defendant, and the same was paid under and in pursuance of an act of Congress, entitled 'An Act to regulate Immigration,' approved August 3, 1882."

On the facts as thus agreed and as found by the Circuit Court, a judgment was rendered in favor of defendant, which we are called upon to review.

There is no complaint by plaintiffs that the defendant violated this act in any respect but one, namely, that it did not authorize him to demand anything for the twenty children under one year old, and for the fifty-nine who were between the ages of one year and eight years.

The supposed exception of this class of passengers does not arise out of any language found in this act to regulate immigration, nor any policy on which it is founded, but it is based by counsel on a provision of an act approved one day earlier than this, entitled " An Act to regulate the carriage of passengers by sea." This provision limits the number of passengers which the vessel may carry by the number of cubic feet of space in which they are to be carried, and it declares that, in making this calculation, children of the ages mentioned need not be counted. In reference to the space they will occupy this principle is reasonable. But, as regards the purpose of the immigration act to raise a fund for the sick, the poor, and the helpless immigrants, children are as likely to require its aid as adults, probably more so. They are certainly within the definition of the word passenger, when otherwise within the purview of the act. This branch of the case requires no further consideration.

The other errors assigned, however numerous or in whatever language presented, all rest on the proposition that the act of Congress requiring the collector to demand and receive from the master, owner, or consignee of each vessel arriving from a foreign port, fifty cents for every passenger whom he brings into a port of the United States who is not a citizen, is without warrant in the Constitution and is void.

The substance of the act is found in its first section, namely:

" An Act to Regulate Immigration.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there shall be levied, collected, and paid a duty of fifty cents

for each and every passenger, not a citizen of the United States, who shall come by steam or sail vessel from a foreign port to any port within the United States.   The said duty shall be paid to the collector of customs of the port to which such passenger shall come, or if there be no collector at such port, then to the collector of customs nearest thereto, by the master, owner, agent, or consignee of every such vessel, within twenty-four hours after the entry thereof into such port.   The money thus collected shall be paid into the United States Treasury, and shall constitute a fund to be called the immigrant fund, and shall be used, under the direction of the Secretary of the Treasury, to defray the expense of regulating immigration under this act, and for the care of immigrants arriving in the United States, for the relief of such as are in distress, and for the general purposes and expenses of carrying this act into effect."   22 Stat. 214.

The act further authorizes the Secretary to use the aid of any State organization or officer for carrying into effect the beneficent objects of this law, by distributing the fund in accordance with the purpose for which it was raised, not exceeding in any port the sum received from it, under rules and regulations to be prescribed by him.   It directs that such officers shall go on board vessels arriving from abroad, and if, on examination, they shall find any convict, lunatic, idiot, or any person unable to take care of himself or herself, without becoming a public charge, they shall report to the collector, and such person shall not be permitted to land.

It is also enacted that convicts, except for political offences, shall be returned to the nations to which they belong.   And the Secretary is directed to prepare rules for the protection of the immigrant who needs it, and for the return of those who are not permitted to land.

This act of Congress is similar in its essential features to many statutes enacted by States of the Union for the protection of their own citizens, and for the good of the immigrants who land at seaports within their borders.

That the purpose of these statutes is humane, is highly beneficial to the poor and helpless immigrant, and is essential to

the protection of the people in whose midst they are deposited by the steamships, is beyond dispute. That the power to pass such laws should exist in some legislative body in this country is equally clear. This court has decided distinctly and frequently, and always after a full hearing from able counsel, that it does not belong to the States. That decision did not rest in any case on the ground that the State and its people were not deeply interested in the existence and enforcement of such laws, and were not capable of enforcing them if they had the power to enact them; but on the ground that the Constitution, in the division of powers which it declares between the States and the general government, has conferred this power on the latter to the exclusion of the former. We are now asked to decide that it does not exist in Congress, which is to hold that it does not exist at all—that the framers of the Constitution have so worded that remarkable instrument, that the ships of all nations, including our own, can, without restraint or regulation, deposit here, if they find it to their interest to do so, the entire European population of criminals, paupers, and diseased persons, without making any provision to preserve them from starvation, and its concomitant sufferings, even for the first few days after they have left the vessel. ·

This court is not only asked to decide this, but it is asked to overrule its decision, several times made with unanimity, that the power *does* reside in Congress, is conferred upon that body by the express language of the Constitution, and the attention of Congress directed to the duty which arises from that language to pass the very-law which is here in question.

That these statutes are regulations of commerce—of commerce with foreign nations—is conceded in the argument in this case; and that they constitute a regulation of that class which belongs exclusively to Congress is held in all the cases in this court. It is upon these propositions that the court has decided in all these cases that the State laws are void. Let us examine those decisions for a moment.

In the *Passenger Cases*, so called, the report of which occupies the pages of 7 Howard from page 283 to 573, mostly with opinions of the judges, the order of the court is that "it is the

opinion of this court that the statute law of New York, by which the health commissioner of the city of New York is declared entitled to demand and receive from the master of every vessel from a foreign port that should arrive in the port of said city the sum of one dollar for each steerage passenger brought in such vessel, is repugnant to the Constitution and laws of the United States, and therefore void." An examination of the opinions of the judges shows that if the majority agreed upon any one reason for this order, it was because the law was a regulation of commerce, the power over which that Constitution had placed exclusively in Congress. The same examination will show that several judges denied this, because they held that this power belonged to the class which the States might exercise until it was assumed by Congress. It is very clear that, if any such act of Congress had existed then as the one now before us, the decision of the court would have been nearer to unanimity.

In the case of *Henderson* v. *The Mayor of New York*, 92 U. S. 259, the whole subject is reviewed, and, in the light of the division in this court in the *Passenger Cases*, it is considered, on principle, as if for the first time. In that case, after the statute of New York had been modified in such a manner as was supposed to remove the objections held good against it in the *Passenger Cases*, the question of its constitutional validity was again brought before this court, when it was held void by the unanimous judgment of all its members. And this was upon the distinct ground that it was a regulation of commerce solely within the power of Congress.

"As already indicated," says the court, "the provisions of the Constitution of the United States, on which the principal reliance is placed to make void the statute of New York, is that which gives to Congress the right ' to regulate commerce with foreign nations.' "

The court then, referring to the transportation of passengers from European ports to those of the United States, says : " It has become a part of our commerce with foreign nations, of vast interest to this country as well as to the immigrants who come among us, to find a welcome and a home within our bor-

ders." "Is the regulation of this great system a regulation of commerce? Can it be doubted that a law which prescribes the terms on which vessels shall engage in it, is a law regulating this branch of commerce?"

The court adds: "We are of opinion that this whole subject has been confided to Congress by the Constitution; that Congress can more appropriately and with more acceptance exercise it than any other body known to our law, State or national; that, by providing a system of laws in these matters, applicable to all ports and to all vessels, a serious question, which has long been matter of contest and complaint, may be effectually and satisfactorily settled." And for this reason the statute of New York was held void.

In the case of the *Commissioners of Immigration* v. *North German Lloyd*, 92 U. S. 259, a similar statute of Louisiana was held void for the same reason. And in the case of *Chy Lung* v. *Freeman*, 92 U. S. 275, decided at the same term, the statute of California on the same subject was also held void, because, in the language of the head note to the report, it "invades the right of Congress to regulate commerce with foreign nations."

In the case of *People* v. *Compagnie Générale Transatlantique*, 107 U. S. 59, where the State of New York, having again modified her statute, it was again held void: the court said: "It has been so repeatedly decided by this court that such a tax as this is a regulation of commerce with foreign nations, confided by the Constitution to the exclusive control of Congress" (referring to the cases just cited), "that there is little to say beyond affirming the judgment of the Circuit Court, which was based on those decisions."

It cannot be said that these cases do not govern the present, though there was not then before us any act of Congress whose validity was in question, for the decisions rest upon the ground that the State statutes were void only because Congress, and not the States, was authorized by the Constitution to pass them, and for the reason that Congress could enact such laws, and for that reason alone were the acts of the State held void. It was, therefore, of the essence of the decision which held the

State statutes invalid, that a similar statute by Congress would be valid.

We are not disposed to reconsider those cases, or to resort to other reasons for holding that they were well decided. Nor do we feel that further argument in support of them is needed.

But counsel for plaintiffs, assuming that Congress, in the enactment of this law, is exercising the taxing power conferred by the first clause of section 8 of article I. of the Constitution, and can derive no aid in support of its action from any other grant of power in that instrument, argues that all the restraints and qualifications found there in regard to any form of taxation are limitations upon the exercise of the power in this case. The clause is in the following language :

"The Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and the general welfare of the United States ; but all duties, imposts, and excises shall be uniform throughout the United States."

In this view it is objected that the tax is not levied to provide for the common defence and general welfare of the United States, and that it is not uniform throughout the United States.

The uniformity here prescribed has reference to the various localities in which the tax is intended to operate. "It shall be uniform throughout the United States." Is the tax on tobacco void, because in many of the States no tobacco is raised or manufactured ? Is the tax on distilled spirits void, because a few States pay three-fourths of the revenue arising from it ?

The tax is uniform when it operates with the same force and effect in every place where the subject of it is found. The tax in this case, which, as far as it can be called a tax, is an excise duty on the business of bringing passengers from foreign countries into this, by ocean navigation, is uniform and operates precisely alike in every port of the United States where such passengers can be landed. It is said that the statute violates the rule of uniformity and the provision of the Constitution, that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of

another," because it does not apply to passengers arriving in this country by railroad or other inland mode of conveyance. But the law applies to all *ports* alike, and evidently gives no preference to one over another, but is uniform in its operation in all ports of the United States. It may be added that the evil to be remedied by this legislation has no existence on our inland borders, and immigration in that quarter needed no such regulation. Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream, as this court has said more than once. *State Railroad Tax Cases,* 92 U. S. 575, 612. Here there is substantial uniformity within the meaning and purpose of the Constitution.

If it were necessary to prove that the imposition of this contribution on owners of ships is made for the general welfare of the United States, it would not be difficult to show that it is so, and particularly that it is among the means which Congress may deem necessary and proper for that purpose; and beyond this we are not permitted to inquire.

But the true answer to all these objections is that the power exercised in this instance is not the taxing power. The burden imposed on the ship owner by this statute is the mere incident of the regulation of commerce—of that branch of foreign commerce which is involved in immigration. The title of the act, "An Act to regulate immigration," is well chosen. It describes, as well as any short sentence can describe it, the real purpose and effect of the statute. Its provisions, from beginning to end, relate to the subject of immigration, and they are aptly designed to mitigate the evils inherent in the business of bringing foreigners to this country, as those evils affect both the immigrant and the people among whom he is suddenly brought and left to his own resources.

It is true not much is said about protecting the ship owner. But he is the man who reaps the profit from the transaction, who has the means to protect himself and knows well how to do it, and whose obligations in the premises need the aid of the statute for their enforcement. The sum demanded of him is not, therefore, strictly speaking, a tax or duty within the

meaning of the Constitution. The money thus raised, though paid into the Treasury, is appropriated in advance to the uses of the statute, and does not go to the general support of the government. It constitutes a fund raised from those who are engaged in the transportation of these passengers, and who make profit out of it, for the temporary care of the passengers whom they bring among us and for the protection of the citizens among whom they are landed.

If this is an expedient regulation of commerce by Congress, and the end to be attained is one falling within that power, the act is not void, because, within a loose and more extended sense than was used in the Constitution, it is called a tax. In the case of *Veazie Bank* v. *Fenno*, 8 Wall. 533, 549, the enormous tax of eight per cent. per annum on the circulation of State banks, which was designed, and did have the effect, to drive all such circulation out of existence, was upheld because it was a means properly adopted by Congress to protect the currency which it had created, namely, the legal-tender notes and the notes of the national banks. It was not subject, therefore, to the rules which would invalidate an ordinary tax pure and simple.

So, also, in the case of the *Packet Co.* v. *Keokuk*, 95 U. S. 80, the city of Keokuk having by ordinance imposed a wharfage fee or tax for the use of a wharf owned by the city, the amount of which was regulated by the tonnage of the vessel, this was held not to be a tonnage tax within the meaning of the constitutional provision that "no State shall, without the consent of Congress, lay any duty of tonnage." The reason of this is, that, though it was a burden, or tax, in some sense, and measured by the tonnage of the vessel, it was but a charge for services rendered, or for conveniences furnished by the city, and was not a tonnage tax within the meaning of the Constitution. This principle was re-affirmed in the case of *Packet Co.* v. *St. Louis*, 100 U. S. 423.

We are clearly of opinion that, in the exercise of its power to regulate immigration, and in the very act of exercising that power, it was competent for Congress to impose this contribution on the ship owner engaged in that business.

Another objection to the validity of this act of Congress, is
that it violates provisions contained in numerous treaties of our
government with friendly nations. And several of the articles
of these treaties are annexed to the careful brief of counsel.
We are not satisfied that this act of Congress violates any of
these treaties, on any just construction of them. Though laws
similar to this have long been enforced by the State of New
York in the great metropolis of foreign trade, where four-fifths
of these passengers have been landed, no complaint has been
made by any foreign nation to ours, of the violation of treaty
obligations by the enforcement of those laws.

But we do not place the defence of the act of Congress
against this objection upon that suggestion.

We are of opinion that, so far as the provisions in that act
may be found to be in conflict with any treaty with a foreign
nation, they must prevail in all the judicial courts of this coun-
try. We had supposed that the question here raised was set
at rest in this court by the decision in the case of *The Cherokee
Tobacco*, 11 Wall. 616. It is true, as suggested by counsel,
that three judges of the court did not sit in the case, and two
others dissented. But six judges took part in the decision, and
the two who dissented placed that dissent upon the ground that
Congress did not *intend* that the tax on tobacco should extend
to the Cherokee tribe. They referred to the existence of the
treaty which would be violated if the statute was so construed
as persuasive against such a construction, but they nowhere in-
timated that, if the statute was correctly construed by the court,
it was void because it conflicted with the treaty, which they
would have done if they had held that view. On the point
now in controversy it was therefore the opinion of all the
judges who heard the case. See *United States* v. *McBratney*,
104 U. S. 621–3.

The precise question involved here, namely, a supposed con-
flict between an act of Congress imposing a customs duty, and
a treaty with Russia on that subject, in force when the act was
passed, came before the Circuit Court for the District of Massa-
chusetts in 1855. It received the consideration of that eminent
jurist, Mr. Justice Curtis of this court, who in a very learned

opinion exhausted the sources of argument on the subject, holding that if there were such conflict the act of Congress must prevail in a judicial forum. *Taylor* v. *Morton*, 2 Curtis, 454. And Mr. Justice Field, in a very recent case in the Ninth Circuit, that of *Ah Lung*, 18 Fed. Rep. 28, on a writ of *habeas corpus*, has delivered an opinion sustaining the same doctrine in reference to a statute regulating the immigration of Chinamen into this country. In the *Clinton Bridge Case*, Woolworth, 150, 156, the writer of this opinion expressed the same views as did Judge Woodruff, on full consideration, in *Ropes* v. *Clinch*, 8 Blatchford, 304, and Judge Wallace, in the same circuit, in *Bartram* v. *Robertson*, 15 Fed. Rep. 212.

It is very difficult to understand how any different doctrine can be sustained.

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that " this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." A treaty, then, is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private

citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

But even in this aspect of the case there is nothing in this law which makes it irrepealable or unchangeable. The Constitution gives it no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date. Nor is there anything in its essential character, or in the branches of the government by which the treaty is made, which gives it this superior sanctity.

A treaty is made by the President and the Senate. Statutes are made by the President, the Senate and the House of Representatives. The addition of the latter body to the other two in making a law certainly does not render it less entitled to respect in the matter of its repeal or modification than a treaty made by the other two. If there be any difference in this regard, it would seem to be in favor of an act in which all three of the bodies participate. And such is, in fact, the case in a declaration of war, which must be made by Congress, and which, when made, usually suspends or destroys existing treaties between the nations thus at war.

In short, we are of opinion that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification, or repeal.

Other objections are made to this statute. Some of these relate, not to the power of Congress to pass the act, but to the expediency or justice of the measure, of which Congress, and not the courts, are the sole judges—such as its unequal operation on persons not paupers or criminals, and its effect in compelling the ultimate payment of the sum demanded for each passenger by that passenger himself. Also, that the money is to be drawn from the Treasury without an appropriation by Congress. The act itself makes the appropriation, and even if this be not warranted by the Constitution, it does not make void the demand for contribution, which may yet be ap-

propriated by Congress, if that be necessary, by another statute.

It is enough to say that, Congress having the power to pass a law regulating immigration as a part of commerce of this country with foreign nations, we see nothing in the statute by which it has here exercised that power, forbidden by any other part of the Constitution.

The judgment of the Circuit Court in all the cases is

*Affirmed.*