**COMMONWEALTH OF MASSACHUSETTS, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 76–1277.**

United States Court of Appeals, First Circuit.

Jan. 28, 1977.

---

Terence P. O'Malley, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for plaintiff-appellant.

Alfred S. Lombardi, Atty., Tax Div., Dept. of Justice, Washington, D.C., with whom Scott P. Crampton, Asst. Atty. Gen., Washington, D.C., James N. Gabriel, U.S. Atty., William A. Brown, Asst. U.S. Atty., Boston, Mass., Gilbert E. Andrews, Jr., and Ann Belanger Durney, Attys., Tax Div., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

The United States imposes an annual tax on the use of all taxable civil aircraft. 26 U.S.C. § 4491. This case involves a challenge by the Commonwealth of Massachusetts to the validity of that annual assessment insofar as it affects the Commonwealth. Specifically, the Commonwealth argued in its suit for a refund in the district court and before us that the tax of $130 [1] imposed on it for the use of its state police helicopter from July 1, 1970 through June 30, 1971, was unconstitutional as violative of the principle of intergovernmental tax immunity. The district court, however, was not persuaded and dismissed the case for failure to state a claim upon which relief could be granted. We affirm, although on a narrower basis than was relied upon by the court.[2]

In its brief and at oral argument before us the Commonwealth has essentially based its entire case on the theory of intergovernmental tax immunity—a theory which the United States alleges is for all practical purposes moribund if not obsolete. While the discussion by both parties of this venerable [3] concept of constitutional law has been

---

1. The annual rate is $25, plus (for an aircraft of the type involved in this case) "3½ cents a pound for each pound of the maximum certificated takeoff weight." 26 U.S.C. § 4491(a).

   The Commonwealth actually sued for a refund in the amount of $183.30, the amount levied by the Internal Revenue Service upon funds of the Commonwealth held by the First National Bank of Boston. This sum includes the underlying tax and also statutorily authorized interest and penalties.

2. The district court dismissal was based on two, apparently independent, predicates. First, the court found persuasive the analysis of the law of intergovernmental tax immunity which is contained in *City of New York v. United States,* 394 F.Supp. 641 (S.D.N.Y.1975), *aff'd,* 538 F.2d 308 (2d Cir.), *cert. denied,* — U.S. ——, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). But the court also said of the challenged tax that it "is actually properly classified as a User's Fee" and saw the existence of a special trust fund as being particularly relevant in that regard. *See* discussion *infra.*

3. *See, e. g., Collector v. Day,* 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1870); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

both scholarly and interesting, we need not decide at this time whether the principle "maintains its vitality," as the Commonwealth contends,[4] or whether it is a "doctrine of questionable validity," as the United States asserts.[5] We are not required to confront this issue because we believe that the tax here at issue is, in reality, a user charge. We view it as "a charge for services rendered [which] represents a quid pro quo, and [which] as such, is outside the scope of the doctrine of implied intergovernmental tax immunity." *Texas v. United States,* 72–2 U.S. Tax Cas. ¶ 16,047 (W.D. Tex.1972), *aff'd,* 73–1 U.S. Tax Cas. ¶ 16,085 (5th Cir. 1973). *See also New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946); *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 265–66, 56 S.Ct. 194, 80 L.Ed. 215 (1935); *Head Money Cases,* 112 U.S. 580, 5 Ct. 247, 28 L.Ed. 798 (1884); *Vicksburg v. Tobin,* 100 U.S. 430, 432–33, 25 L.Ed. 690 (1879); *Packet v. Keokuk,* 95 U.S. 80, 24 L.Ed. 377 (1877). *Cf. Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); *Cannon v. New Orleans,* 87 U.S. (20 Wall.) 577, 581–82, 22 L.Ed. 417 (1874).

In 1970 Congress enacted both the Airport and Airway Development Act of 1970, P.L. 91–258, 84 Stat. 219, and the Airport and Airway Revenue Act of 1970, P.L. 91–258, 84 Stat. 236. These two acts were considered together and were passed simultaneously. In their combined form they are commonly referred to as the Airport and Airway Development and Revenue Acts of 1970, Act of May 21, 1970, P.L. 91–258, 84 Stat. 219. Title I of the combined act provides for the expansion and development of various air transportation programs, and Title II deals with the raising of revenue to fund such programs. Various user charges were established by Congress as a partial source of this needed revenue. It is abundantly clear from the legislative history of the Acts that Congress intended the tax imposed by § 4491[6] to be part of this overall scheme of user charges. Purely by way of example, we may cite the following language from the House Report:

"[T]he Ways and Means Committee has decided to also establish a schedule of annual registration taxes for both commercial and general aviation aircraft. . . . It appears appropriate to impose some direct user charge on air carriers themselves in addition to the increased taxes on air passengers and air shippers, since air carriers presently are not paying a direct user tax with respect to the use of the aviation system. The aircraft registration fee is based upon the premise that all aircraft should pay a basic fee as an entry fee to use the system." H.R.Rep. No. 91–601, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin. News, pp. 3047, 3085.

■ Of course, the fact that an assessment is *labeled* a user charge is not of itself conclusive. *Cf. Packet Co. v. Keokuk, supra,* 95 U.S. at 86, 24 L.Ed. 377. Rather "[i]t is the thing, and not the name, which is to be considered." *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 314, 13 L.Ed. 996 (1851). But in this instance the term "user charge" well describes the essence of the challenged assessment. The revenue raised by this charge is applied directly to benefit those who must pay the

---

**4.** *Compare New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946) *with National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *See also Fry v. United States,* 421 U.S. 542, 547–48 n. 7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975); Note, Municipal Bankruptcy, The Tenth Amendment and the New Federalism, 89 Harv. L.Rev. 1871, 1873–74 (1976).

**5.** *See, e. g., City of New York v. United States, supra. See also* Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regula-

tion: Separation of Powers Issues in Controversies about Federalism, 89 Harv.L.Rev. 682, 712 & n. 138 (citing cases). *See generally* Powell, The Remnant of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 757 (1945); Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633 (1945).

**6.** In our view, the fact that this tax is codified in the Internal Revenue Code (26 U.S.C.) is irrelevant to the question of whether or not it is in reality a user charge.

charge. "The sum demanded . . . is not, therefore, strictly speaking, a tax or duty within the meaning of the Constitution. The money this raised . . . is appropriated in advance to the uses of the statute, and does not go to the general support of the government." *Head Money Cases, supra,* 112 U.S. at 595–96, 5 S.Ct. at 252.

In *Packet Co. v. Keokuk, supra,*[7] the Supreme Court explained why such charges are readily distinguishable from general taxes:

> "To determine whether the charge prescribed by the ordinance in question is a duty of tonnage, within the meaning of the Constitution, it is necessary to observe carefully its object and essence. . . . [A] charge for services rendered or for conveniences provided is in no sense a tax or a duty. . . . It is a tax or a duty that is prohibited: something imposed by virtue of sovereignty, not claimed in right of proprietorship. Wharfage is of the latter character. Providing a wharf to which vessels may make fast, or at which they may conveniently load or unload, is rendering them a service. . . . [A]nd, when compensation is demanded for the use of the wharf, the demand is an assertion, not of sovereignty, but of a right of property." 95 U.S. at 84–85, 24 L.Ed. 377.

■ The applicability of the *ratio* of the *Keokuk* case to the case at bar is clear. In each instance the challenged tax—when "its object and essence" is observed—is demonstrably "a charge for services rendered." *Id.* at 84, 24 L.Ed. 377, It is uncontested that the moneys raised by the tax at issue here will result in improved airports and airways, which improvements will be beneficial to all users of the system even if not equally to all users. There is simply no indication that the challenged registration tax is anything more than a relatively miniscule assessment to help finance "services

rendered to and enjoyed by" aircraft generally. *Clyde Mallory Lines v. Alabama, supra,* 296 U.S. at 266, 56 S.Ct. at 196.

An additional feature of the legislation establishing the tax at issue here which reinforces our view that it is a user charge is Congress's establishment of an Airport and Airway Trust Fund. This trust fund is the repository, *inter alia,* of funds raised under 26 U.S.C. § 4491. *See* 49 U.S.C. § 1742. It was created "in order to insure that the air user taxes are expended only for the expansion, improvement, and maintenance of the air transportation system." H.R.Rep. No. 91–601, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News, pp. 3047, 3085. The existence of this fund reflects the "direct relationship between the use of the system and the money generated to meet the needs required by the users." *Id.* at p. 3049.

Accordingly, whatever might be the current state of the law regarding intergovernmental tax immunity, we are convinced that "[n]othing in the historical basis of dual sovereignty underlying the principle of state immunity from federal taxation requires that the states continue to receive the benefit of airway facilities and services actually used by the states but furnished by the Federal Government without bearing their equitable share of the costs incurred in providing those particular benefits. . . . No logical reason exists why all users of the air transportation system should not pay their fair share of such costs." *Texas v. United States, supra.*

*Affirmed.*

---

7. The *Keokuk* case concerned a challenge to wharfage fees charged (on a per ton basis) by a municipal corporation. The Supreme Court rejected the argument that such fees contravened

the constitutional prohibition against a state "lay[ing] any duty of tonnage" (U.S.Const. art. I, § 10).