EDITH BROWN CLEMENT, Circuit Judge,
concurring in the judgment:
I would hold that the relevant treaty provision, Article II of the Convention, is self-executing and that it therefore preempts Louisiana Revised Statute § 22:868 by virtue of the Supremacy Clause. This result is dictated by the decisions of the Supreme Court, most recently in Medellín v. Texas, 552 U.S. 491, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008), differentiating self-executing from non-self-executing treaty provisions. The conclusion that Article II is self-executing possesses the added benefit of avoiding a difficult constitutional question,[1] namely what *733 preemptive effect (if any) non-self-executing but implemented treaty provisions have under the Supremacy Clause. The majority is convinced that such treaty provisions have full preemptive effect, proceeding on the assumption that Article II is not self-executing. The dissent, meanwhile, persuasively refutes the majority’s answer to the constitutional question, but its disposition relies on a finding that no provision of the Convention is self-executing. Neither opinion confronts the important antecedent question whether Article II is in fact self-executing.[2] The opinions’ contrasting interpretations of the Supremacy Clause are unnecessary to decide the case because the plain text of Article II of the Convention compels a finding of self-execution.
In Medellin, the Court “recognized the distinction between treaties that automatically have effect as domestic law, and those that — while they constitute international law commitments — do not by themselves function as binding federal law.” 128 S.Ct. at 1356. The Court traced this distinction to Foster v. Neilson, in which Chief Justice Marshall explained:
Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court.
27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829). That non-self-executing provisions depend upon congressional implementing legislation to take effect as enforceable domestic law was recognized as early as Whitney v. Robertson, 124 U.S. 190, 194, 8 *734 S.Ct. 456, 31 L.Ed. 386 (1888) (“When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect .... ”). Self-executing provisions, on the other hand, “require no legislation to make them operative” and “have the force and effect of a legislative enactment.” Id.
The text of the relevant treaty provision, Article II, provides:
1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.
2. The term “agreement in writing” shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.
3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.
Medellin provides lower courts with a framework for determining whether treaty provisions are self-executing. The Court made clear that “[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text.” Medellín, 128 S.Ct. at 1357; see id. at 1361-62 (identifying “explicit textual expression” as the focus of the self-execution analysis). Although the Supreme Court has never expressly held that individual treaty provisions may be self-executing, while a treaty in its entirety may not be, its case law leads inescapably to this conclusion. As early as Whitney, the Court differentiated between the two types of provisions:
When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment.
124 U.S. at 194, 8 S.Ct. 456. More recently, the Medellin Court noted its “obligation to interpret treaty provisions to determine whether they are self-executing.” 128 S.Ct. at 1362 (emphases added).[3]
Of particular concern here is Section 3 of Article II, which provides that domestic courts, upon request of a litigant, shall enforce any arbitration agreement to which that litigant is a party by referring the parties to arbitration. Section 3 is addressed to the courts of Contracting States, not to the States themselves or to their respective legislatures.[4] Further, *735 Section 3 provides that a “court ... shall ... refer the parties to arbitration.” Referral to arbitration is mandatory, not discretionary. Treaty provisions setting forth international obligations in such mandatory terms tilt strongly toward self-execution. See id. at 1358, 1359 n. 5 (distinguishing between treaty language that constitutes a commitment to future action, such as “undertakes to comply,” and treaty language using “shall” or “must”).
The text of Article II constitutes “a directive to domestic courts.” Id. at 1358 (identifying the failure of Article 94 of the United Nations charter to include a directive to domestic courts as a basis for a finding of non-self-execution). It leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes; instead, that rule is enforceable by the Convention’s own terms.[5] See Foster, 27 U.S. at 314 (declaring a treaty to be self-executing “whenever it operates of itself without the aid of any legislative provision”). In the Head Money Cases, the Supreme Court explained that when a treaty provision addresses “rights ... of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.” Edye v. Robertson, 112 U.S. 580, 599, 5 S.Ct. 247, 28 L.Ed. 798 (1884) [Head Money Cases]; id. at 598-99, 5 S.Ct. 247 (“A treaty, then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.”). The terms of Article II do not merely describe arbitration rights which are “of a nature to be enforced in a court of justice,” but expressly instruct courts to enforce those rights by referring the parties to arbitration. In short, Article II of the Convention is self-executing and fully enforceable in domestic courts by its own operation.[6] It is entitled to recog *736 nition as “the supreme Law of the Land” under the Supremacy Clause. U.S. Const. art. VI, cl. 2.
Certain references to the Convention and Convention Act by the Medellin Court, the Second Circuit, and this court arguably support a contrary position. I briefly explicate why this is not the case. In Medellin, the Court cited the Convention Act for the proposition that “[t]he judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress.” Medellín, 128 S.Ct. at 1366. It went on to state: “Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result.” Id. The majority construes this dictum narrowly, opining that it “could be read to imply that the Convention in its entirety is not self-executing, although such a conclusion cannot be drawn with any certainty from the brief discussion in the Court’s opinion.” I would conclude that the dictum offers little support for the view that the Convention is non-self-executing in all respects.
Importantly, Medellin itself concerned the enforceability of a judgment of the International Court of Justice. See id. at 1356 (“The question we confront here is whether the Avena judgment has automatic domestic legal effect such that the judgment of its own force applies in state and federal courts.” (emphasis in original)). The Court’s dictum cited the Convention Act as an exemplar of Congress’s ability to accord “domestic effect” to the judgments of similar international tribunals. The United States’s obligation to “recognize arbitral awards as binding” is set forth in Article III of the Convention.[7] It was therefore Article III, and not Article II, that the Medellin Court was addressing. Unlike Article II, Article III contains no language addressed to the courts of Contracting States and instead addresses itself only to the Contracting States themselves. The “international obligation[ ]” to which Congress was according “domestic effect” was therefore the one spelled out in Article III: the recognition of arbitral awards as binding and enforceable. That Congress would perceive a need to enact implementing legislation to render Article III enforceable in domestic courts says nothing about Article II’s self-execution status, especially where, unlike Article II, Article III lacks an explicit directive to “[t]he court of a Contracting State.” I would not *737 read the Medellin Court as having indicated that the Convention is non-self-executing.
Meanwhile, the Second Circuit, in Stephens v. American International Insurance Co., concluded that “the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation.” 66 F.3d 41, 45 (5th Cir.1995). The court, however, undertook no textual analysis and set forth no reasons to support its conclusion. Moreover, the case was decided before Medellin, which provides critical guidance to lower courts for determining when treaty provisions are self-executing. Similarly, other panels of this court appear to have concluded that the treaty, as a whole, was enforceable only after Congress passed the Convention Act.[8] Again, these decisions predate the instructions set forth in Medellin and do not appear to have specifically considered the text of Article II.
Although there may be a growing judicial consensus that multilateral treaties are presumptively non-self-executing, my conclusion that Article II of the Convention is self-executing is compelled by a straight forward application of binding Supreme Court precedent. The majority and dissent bypass the self-execution question. I would instead hew, as we must, to the plain language of Medellin and conclude that Article II is self-executing.
Because Article II of the Convention mandates enforcement of arbitration agreements, it conflicts with and therefore preempts Louisiana law. On this basis, I would vacate the district court’s denial of the motion to compel arbitration and remand for further proceedings.

. Contrary to the dissent's conclusion, the Underwriters have not waived the self-execution argument. In their opening brief to the panel, they contended that the treaty provision was self-executing by stressing their reliance "solely upon the provisions of Article II of the Convention ... and not on any special implementing legislation.” Appellant Br. 33 n. 17. That this argument was presented to the panel is plainly reflected in its opinion. Safety Nat'l Cas. Corp. v. Certain Underwriters at Lloyd’s, London, 543 F.3d 744, 749 (5th Cir.2008), vacated and reh’g en banc granted, 558 F.3d 599 (5th Cir.2009) ("The Underwriters maintain that the Convention was ratified after the McCarran-Ferguson Act was enacted and that in any event, the Convention is self-executing, which means that it did not require an act of Congress to have effect in United States courts. The Underwriters assert that a 'later-in-time self-executing treaty supercedes a federal statute if there is a conflict.' ” (emphasis added)).
In addition, none of the cases cited by the dissent establishes that a party suffers waiver should it fail to repeat to the en banc court every argument that it made to the panel. Further, read in context, the language taken by the dissent from the Underwriters’ en banc reply brief does not concede the self-execution point. As the section heading preceding that language makes clear, the Underwriters addressed the "primaiy” question "[p]osed by the [p]anel.” Appellant En Banc Reply Br. 6. Underwriters should not be penalized for focusing their en banc briefing on the major issue addressed by the panel. Relatedly, LSAT cannot complain that it lacks notice of self-execution as a ground for disposition because its en banc brief understands the self-execution question to be contested, urging the court to "find ... that the Convention was not self-executing.” Appellee En Banc Br. 27-40.

. This court has reached a similar conclusion. See United States v. Postal, 589 F.2d 862, 878 (5 th Cir.1979) (recognizing the United States's capacity to enter into a multilateral treaty containing provisions which do not require implementing legislation). The fact that other, unrelated provisions of the Convention could be read to contemplate future legislative implementation — Articles X and XI, for instance — does not render the entire treaty non-self-executing, especially when the plain text of Article II counsels to the contrary.

. Article II, Section 1 does contain a reference to Contracting States, which provides that such States "shall recognize" arbitration agreements. Any suggestion that this reference renders Article II non-self-executing is *735 overcome by the fact that Section 3 sets forth a specific mechanism — enforcement by referral to arbitration — and tasks the courts of Contracting States, and not their legislatures, with accomplishing that recognition.

. There is a plausible argument that the "null and void” language of Article II, Section 3 would permit a domestic court to refuse to enforce an arbitration agreement because of a contrary state law such as § 22:868. However, in Scherk v. Alberto-Culver Co., the Supreme Court heeded the "concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements.” 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Further, in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., the Court acknowledged that Congress could carve out "categories of claims it wishes to reserve for decision by our own courts,” but made no mention of individual states' capacity to do so. 473 U.S. 614, 639 n. 21, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). It follows that whatever Congress’s ability to specify when an arbitration agreement is "null and void,” a state law is powerless to undermine the "utility of the Convention in promoting the process of international commercial arbitration.” Id.

. The Medellin Court pointed out that in prior cases, in addition to a treaty's text, it had "also considered as 'aids to [a treaty's] interpretation' the negotiation and drafting history of the treaty as well as 'the post-ratification understanding’ of signatory nations.” 128 S.Ct. at 1357 (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996)); see also Air France v. Saks, 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) ("Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.” (emphasis added) (quotation and alteration omitted)). Because the treaty text is clear, I see no need to rely on such extra-textual "aids” to interpret its meaning.
*736 I would note, however, that the existence of the Convention Act is not inconsistent with a finding that Article II is self-executing. On July 31, 1970, Congress passed the Convention Act; the United States acceded to the Convention on September 30, 1970, and its accession entered into force on December 29, 1970. That Congress acted prior to accession taking effect suggests that the Convention Act was intended to establish limitations upon the enforcement of the Convention in domestic courts before it would otherwise take effect. See Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) ("Congress may modify [self-executing] provisions, so far as they bind the United States, or supersede them altogether.”); Head Money Cases, 112 U.S. at 599 (“[S]o far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or repeal.”).

. Article III states, in full:
Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

. See Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 903 (5th Cir.2005) ("Because the United States is a signatory to the Convention, and Congress enacted enabling legislation, the Convention is applicable as federal law in this case.”); Sedco, Inc. v. Petroleos Mexicanos Mexican Mat'l Oil Co., 767 F.2d 1140, 1145 (5th Cir.1985) ("The Convention was negotiated pursuant to the Constitution's Treaty power. Congress then adopted enabling legislation to make the Convention the highest law of the land.”).