## UNION SULPHUR CO. v. REID, Sheriff, et al.

### (District Court, W. D. Louisiana. December 13, 1920.)

### No. 45.

1. **Taxation ☞338—Mined sulphur held assessable as movable property, and not as part of realty.**

   Sulphur, which had been removed from underground in a liquid state and allowed to solidify, is not part of the realty, but was properly assessed as movable property, though it was in such large blocks it would have to be blasted before it was loaded for shipment.

2. **Taxation ☞319 (2)—Assessment appealed from is presumed to be correct.**

   The assessment of property for taxation is presumed to be correct; the burden of proof which devolves upon the actor in all litigation being emphasized by the necessity of overcoming the presumption that the Legislature properly exercised its taxing power, and that taxing officers did not violate their sworn duty.

3. **Taxation ☞611 (6)—Evidence held not to show property was assessed at more than its real value.**

   In a suit to restrain the sale of sulphur mine for taxation, which plaintiff claimed was based on an overassessment, computation of the value of the plaintiff's property by an expert mining engineer and economist, though theoretically correct, *held* not to show the property was assessed above its real value, in view of discrepancies between the figures as to price and profit, adopted by the expert, and the past experiences of the company.

4. **Taxation ☞40 (8)—Undervaluation of other property must be intentional and habitual, to establish unconstitutional discrimination.**

   To establish discrimination in the assessment of property, contrary to the state and federal Constitutions, evidence that other property was undervalued in certain instances is not sufficient; but it must be shown that the undervaluation of such other property was intentional, systematic, and persistent.

5. **Taxation ☞611 (6)—Evidence held not to establish intentional discrimination in assessment.**

   Evidence that oil lands in the state were assessed under a rule which made their total valuation less than their production for the year, and that the assessment of agricultural lands was 71 per cent. of the sale price of such lands, including credit as well as cash sales, *held* not to show such discrimination against the assessment of a sulphur mine, which was assessed at not to exceed its real value under a rule applied to salt mines, which were the only other similar property in the state, in view of testimony of plaintiff's own witness that the board of state affairs had, since its organization, been making an honest effort to assess all property at full cash value, as required by the state Constitution.

In Equity. Suit by the Union Sulphur Company against H. A. Reid, Sheriff of Calcasieu Parish, La., and others, to restrain the sale of property for taxes. Decree rendered, denying relief sought.

A. P. Pujo, of Lake Charles, La., and J. T. Kilbreth and Chas. Neave, both of New York City, for plaintiff.

A. V. Coco, Atty. Gen., L. E. Hall, Asst. Atty. Gen., and E. R. Kaufman and J. A. Williams, both of Lake Charles, La. (Harry P. Sneed, of New Orleans, La., of counsel), for defendants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

JACK, District Judge. This suit is brought by the Union Sulphur Company to secure a reduction in the assessment of its property in the parish of Calcasieu. Since 1903 it has been engaged in the mining of sulphur by means of a patented process known as the Frasch method. The mine, which covers an area of about 62 acres, was closed early in 1919, and operations have not yet been resumed. The deposit usually referred to as sulphur, but technically known as brimstone, in contradistinction to sulphur in pyrites, is in a strata in the form of a dome. If an ordinary water bowl were filled with earth, and then buried in the ground in an inverted position, the vessel would be a fair representation of the sulphur-bearing rock in the mine. The top of the dome extends to within about 500 feet of the surface. Wells, similar to oil wells, are bored into the deposit and by means of superheated water the sulphur is liquified and pumped to the surface of the earth, where it is congealed in large bins. When the sulphur hardens, the sides of the bins are removed leaving enormous cubes of sulphur. Later it is broken into pieces by blasting, and loaded into cars for shipment. As the brimstone is extracted, the ground above sinks, and it becomes necessary to fill in the surface depression. During the past few years this filling process has been discontinued, and there is now a circular depression extending around the mine, which it will be necessary to fill when operation is renewed.

On January 1, 1919, there had accumulated in the stock pile 939,158 tons of sulphur, graphically described by Mr. Walter R. Ingalls, an eminent mining engineer and economist, as "the greatest accumulation of an elemental substance that the hand of man had ever gathered together." In its rendition to the assessor, the plaintiff combined in one item the sulphur deposit underground and the sulphur in the stock pile, and placed thereon a value of $9,979,961.50, which, together with the mining machinery, valued at $374,145.02, made an aggregate total valuation of $10,354,106.52. The final assessment fixed by the State Board of Affairs was $13,916,275 for the stock pile of sulphur and $15,500,000 for the mine and machinery, making a total of $29,416,275.

The plaintiff, claiming that it had been overassessed in round figures $19,000,000, paid into court the amount of taxes which would be due on an assessment equal to its rendition, which taxes were accepted by the collector without prejudice to the rights of the state and parish to demand payment of the balance claimed to be due, $362,181.20. A temporary restraining order, enjoining the sale of the property for the payment of taxes alleged to be due, was issued, and the question now presented is the validity of the assessment.

It is alleged that, although there are certain fair, reasonable, and well-known principles and methods for determining the actual cash value of mining properties, which are regularly employed for that purpose by mining engineers, economists, and taxing authorities, that the defendants neglected and refused to apply any of such standard principles and methods, but by the application of arbitrary, unreasonable, and discriminatory methods, different from those employed in the assessing of other taxpayers of the same class, assessed plaintiff's property at a

sum three times its actual cash value; that the collection of taxes based on said assessment would constitute a taking of plaintiff's property without due process of law, and would be a denial to plaintiff of the equal protection of the law, in violation of the Constitution of the state of Louisiana and of the Fourteenth Amendment to the federal Constitution; that said assessments are unconstitutional and void, in that they are discriminatory, and the result of "an intentional, habitual, and systematic overvaluation" of plaintiff's property, whereas the property of other taxpayers of the same class is not in like manner over valued.

The prayer of the bill is that the tax collector be enjoined from selling plaintiff's property, and that the assessment of same be declared void, and that defendants be ordered to cancel such assessment, thus removing the cloud upon plaintiff's title, and, in the alternative, that the assessment be reduced to such amount as may be reasonable and proper.

The answer denies that the assessment was erroneous or irregular, and, on the contrary, avers that it was fair and just. It avers that defendants did use fair, reasonable, and well-recognized methods and principles in determining the actual cash value of the property, and specially denies that the assessment was discriminatory, or the result of any intentional, habitual, and systematic overvaluation of complainant's property.

The state Constitution provides that— .

"Taxation shall be equal and uniform throughout the territorial limits of the authority levying the tax, and property shall be taxed" in a manner "directed by law: * * * Provided, further the assessment of all property shall never exceed the actual cash value thereof; and provided, further, that the taxpayers shall have the right of testing the correctness of their assessments before the courts of justice." Const. art. 225.

By Act 170 of 1899, as amended by Act 130 of 1902, the "actual cash value" is declared to mean the price at which such property would sell for cash in the ordinary course of business.

[1] The mined sulphur, though requiring blasting in loading for shipment, is not a part of the realty. Like mined coal, it is movable property, and was properly assessed as such, separately from the mine and machinery. The plaintiff was assessed as of date January 1, 1919, with 914,501 tons of such sulphur at $15.22 per ton, being the average amount carried and the average price received during the year 1918. This average amount was 24,657 tons less than the amount actually on hand and subject to assessment January 1, 1919, and the average 1918 price was $4.78 less per ton than it was selling for on that date; the price fixed by the government of $22 per ton being then in effect.

The mine was assessed in 1919 for the same amount as in 1918. The manner in which the assessment for 1918 was made is thus set forth in a letter of the board to the president of the police jury of Calcasieu parish:

"We determined this value by taking the average yearly production of the mine for the past ten years. The figures furnished us by the Sulphur Company show that in the past ten years they have produced 4,148,299 tons of

sulphur. The average production would therefore be 414,829 tons. The Sulphur Company also furnished us a statement showing that they make an average net profit of $5.65 per ton on sulphur. In order to determine the value of the mine, we capitalized the average yearly net profit by 15 per cent. This gave us a total valuation of $15,625,000. In order to have the amount in round figures, we took off of this value $125,000, and made it, in round figures, fifteen and a half million dollars."

It is urged that, as during the year 1918 there was taken from the mine 918,700 tons of sulphur, it was thereafter worth considerably less, and hence that the assessment for 1919 was wholly arbitrary. The valuation of the mine, it is claimed, should not have been based on the past production and profits, but on its expected future production and ability to make profits. Mr. Ingalls, heretofore referred to, placed on the stand by plaintiff, and asked if there were any generally recognized fundamentals or principles of mine valuation, thus succinctly described what is known as the Hoover method, so called because advocated by Mr. Herbert Hoover in a treatise on the subject:

"A. There is just one principle that is commonly accepted and agreed upon, and that principle may be expressed in a very few words; it is simply the capitalization of expected earnings reduced to present value, and allowing for the return of the principal invested—the last being in recognition of the fact that a mine is always a wasting asset. There is nothing new in that principle; it has been employed in the valuation of mines, to my own knowledge, for the last 35 or 40 years, I should say; anyway, as far back as the '80's. * * * It involves the determination of the quantity of ore or valuable mineral existing, or to be expected, in the mine; next, the determination of the annual earnings to be expected from production during the period of the life of the mine, as shown by the determination of the quantity existing.

"In the determination of the annual earnings there are three factors: First, the quantity of production; next, the market price that can be forecasted as being realizable; and, third, the cost of production. The annual earnings having been determined, and the number of years for which those annual earnings can be expected to continue having also been determined, it becomes a matter of mathematical computation as to the present value of such annual earnings. For such a computation it is necessary to assume a rate of interest on the investment, or on the worth of the property, that would correspond with the risks involved in the particular enterprise; and it is necessary, furthermore, to figure a further rate of interest that will produce a sinking fund that will return the principal upon the exhaustion of the mine—the last being in recognition of the fact that a mine is a wasting asset, and that the ore, once taken out of it, is gone forever, and is never in any way replaced."

From the logs of the 546 wells drilled, Mr. Ingalls was enabled to ascertain the general shape of the sulphur-bearing rock, and to estimate the cubical content, and, from such data, to determine approximately the original brimstone content of the mine, estimating to a depth of 1.300 feet, below which it appears it is unprofitable to mine, and, by deduction of the sulphur extracted up to date, to estimate the amount of available sulphur remaining underground. His figures were: Original brimstone content, 10,349,436 tons; extracted to January 1, 1919, 5,813,792 tons; remaining on that date 4,535,644 tons. This estimate of the original content is just about 1,000,000 tons more than that of the Channing Commission, which made an estimate for the government shortly after our entrance into the World War, and, I think, is a liberal

one. Mr. Ingalls says, in making it, he considered that he "had gone to the very limit of engineering daring."

Having determined the estimated quantity of sulphur remaining in the mine, and the life of the mine on a basis of extraction of 250,000 tons yearly, he estimated the probable actual sale of sulphur, its probable selling price, and probable cost of production, and from these, the mine's probable net earnings. The net earnings he capitalized on the basis of 14 per cent. net return on the investment, and 3½ per cent. for a sinking fund to return the capital, a total of 17½ per cent., thus reaching the conclusion of a total valuation of the mine and stock pile from ten to twelve million dollars.

Ingalls' method of valuation of the mine, including sulphur above ground, is thus specifically stated:

"A. * * * I will read in detail what may be taken as a sample of the basic computation. The basis of computation is a net yield of 14 per cent. on the principal, and reinvestment of sinking fund at the rate of 5 per cent.; liquidation of surplus stock of sulphur, 750,000 tons, at the rate of 250,000 tons per annum, at $10 per ton f. o. b. mine; 250,000 tons per annum at $10 per ton produces $2,500,000. Deducting expenses for breaking and loading and for taxes as estimated, $475,000, gives annual net realization of $2,025,000. The present value of $1 per annum for three years at 5 per cent. is $2.72325; the present value of $2,025,000 per annum for three years is therefore $2,025,000, multiplied by the factor of 2.7+, or $5,514.581. Now, in order to obtain that realization, it is, it has been, it would be—give it the form of the verb that you please—necessary to shut down the mining plant for the period of three years, corresponding with this estimate, during which period of idleness it is going to suffer deterioration to the extent of half a million dollars, as I estimated it. That deterioration is a charge against the liquidation of the surplus stock of sulphur. Deducting that charge give a value of $5,014,581 as the present value of the 750,000 tons of surplus stock of sulphur. Understand, please, when I say 'present value,' without further explanation, that I mean value as of January 1, 1919. The sulphur remaining in the mine was 4,535,644 tons. Period of production at 250,000 per annum, 18 years; selling price, $10; cost of production, $6.10; profit per ton, $3.90; annual profit, 250,000 tons times $3.90, or $975,000. Net yield, estimated 14 per cent. Required for sinking fund at 5 per cent., 18 years, 3.5546 per cent. Gross yield required, 17.5546 per cent. Annual earnings of $975,000, capitalized at the rate of 17.5+ per cent., $5,554,100. The above, however, is the value after the lapse of three years, for the reason that realization cannot begin until the surplus stock of sulphur has been liquidated. It is therefore not a present value, but a value deferred for three years. The present value of $1 that cannot be realized for three years is 86.384 cents. The present value of $5,554,100, realizable after the lapse of three years, is therefore $4,797,854. Now, in stressing or pushing production during the period of war, filling of the surface of the mine was neglected to the extent of 2,500,000 cubic yards, according to my own measurements. That filling is something that is owing to the mine; it must be done in order to permit production to proceed. I estimate the cost of that filling at 30 cents per cubic yard, $750,000 as the debt to the mine on that account, deducting which gives a present value for the mine of $4,047,854. As I stated yesterday, a quantity of sulphur that I estimated at 189,158 tons must be carried continuously as a working stock to the end of the life of the mine. At that time, at the end of the mine, after the lapse of 22 years, as herein estimated, that working stock is reckoned as having a net value—deducting charges for breaking and loading, taxes and general expense—as having a net value of $9.30 per ton. The present value of $1 realizable after the lapse of 22 years, is 34.185 cents; the present value, therefore, of 189,000 tons at $9.30 per ton, times the factor of 34.185 is $601,372. Summarizing, then, we have

750,000 tons of surplus sulphur, $5,414,581, which I put into a round figure as $5,400,000; 189,158 tons of working stock of sulphur, $601,317, which I put at $600,000 as a round figure. The value of the mine itself, $4,047,854, which I put, for a round figure, at $4,000,000; total, $9,663,807, which I put at a round figure of ten million dollars. Now, as I said, this is a basic and a typical computation. Values might be reckoned differently within moderate limits, according to the different conditions that might arise. At the time that I made this valuation, I foresaw certain differences in conditions that might arise through modifications of the method of working the mine or otherwise; and I foresaw that such differences might increase the value of the mine to a round figure of twelve million dollars. I reported, consequently, that in my opinion, the value of this mine—and I mean by that, not only the mine, but also the surplus stock of sulphur as I explained yesterday—I rendered the opinion that the value of the mine, in my judgment, as of January 1, 1919, was from ten million dollars to twelve million dollars. By that I mean that I would advise a purchaser to give ten million dollars for it. I would further advise him to go up to twelve million dollars, if he had to do it and he wanted it badly enough; but above twelve million dollars I would not go. My range of valuation of this property, on January 1, 1919, taking all things into consideration, was from ten to twelve million dollars."

From the foregoing it will be noted that he divided the mined sulphur into two lots, 189,000 tons as working stock, and 750,000 tons as surplus stock. The property he then valued as follows: Working stock, $600,000; surplus stock, $5,400,000; mine, including machinery, $4,000,000.

Counsel for the defendant, if they do not specifically admit, at least do not contest the correctness of the estimate of the sulphur remaining in the mine, which, I think, may be accepted as being as near accurate as engineering skill can determine. While counsel does not question Ingalls' figures and estimates as an engineer, they do take issue with him as an economist on his forecasts and figures as to future prices, cost of mining, profits, etc.

Having estimated the total quantity of sulphur above and below ground, Ingalls next determined the life of the mine on the basis of a production and sale of 250,000 tons a year. This reduced production and sale from that of previous years being based on the annulment of the Frasch patents, and the fact that there are now two competing companies operating similar mines at Freeport and Matagouda, Tex., whereas, previously, plaintiff enjoyed a monopoly, having to compete only with imported sulphur in the form of pyrites. On the 1st of January, 1919, however, the Frasch patents had not yet been annulled. On the contrary, they had been affirmed by the lower court and the case was pending on appeal. Furthermore, the Freeport mine had, in disregard of the patents, been in competition with plaintiff since 1914.

The amount of sulphur sold each year during the 11 years immediately preceding 1919 is shown by the following table, which likewise shows the price, profit per ton, and total profit on the product f. o. b. cars at the mine. During only two of these years were the sales as low as 250,000 tons. Of course, the sales during the period of the war would not be a fair criterion, as sulphur was used very largely in the manufacture of munitions:

| Year. | Tons Sold. | Average Price. | Average Profit. | Total Profit. |
|---|---|---|---|---|
| 1908 | 209,281.985 | $17.312 | $11.874 | $ 2,484,800.48 |
| 1909 | 236,053.345 | 17.872 | 13.354 | 3,152,574.91 |
| 1910 | 254,984.479 | ·18.088 | 13.046 | 3,326,480.65 |
| 1911 | 264,819.850 | 18.116 | 11.631 | 3,079,765.03 |
| 1912 | 302,341.700 | 17.374 | 14.176 | 4,285,719.92 |
| 1913 | 299,215.225 | 18.133 | 13.740 | 4,111,092.93 |
| 1914 | 301,904.852 | 18.222 | 13.367 | 4,034,846.33 |
| 1915 | 212,187.045 | 17.810 | 12.724 | 2,699,712.31 |
| 1916 | 507,712.991 | 17.761 | 12.957 | 6,513,842.34 |
| 1917 | 657,397.302 | 18.409 | 13.496 | 8,872,146.72 |
| 1918 | 858,847.311 | 20.791 | 15.159 | 13,028,265.09 |
| | | | | |
| Totals | 4,099,746.085 | | | $55,589,246.71 |
| Average | 372,704.189 | $18.562 | $13.559 | $ 5,053,567.90 |

The average price for future sales, Mr. Ingalls fixed at $10 per ton, being the price at which it was selling when he gave his testimony, but less than half the price fixed by the Government, $22, at which it was selling on January 1, 1919. The least price it had brought in the 11 years previous was $17.312, in 1908.

The cost of production he estimated at $6.10, leaving the net profit $3.90, whereas the average net cost for the past 11 years, including 1911, when the witness states conditions of operation were bad, was only $4.816. During the years 1917 and 1918, when wages were everywhere at their highest, and all kinds of work very expensive, the cost was only $4.577 and $5.215, respectively. With the termination of the war, one might have foreseen a decline in the price of sulphur, but with a corresponding decrease in the cost of production. No good reason is shown to have apprehended an increase in the cost of production during the remainder of the life of the mine, estimated at 22 years, including delay in resuming operation, nor did there appear sufficient reason to have forecasted such a steep decline in profits because of the decreased demand for sulphur and the addition of one competitor. The average net profits for the preceding 11 years had been $13.559 per ton.

Ingalls' estimate of loss by deterioration in the machinery during a 3-year forecast of inoperation exceeds by over $125,000, the total value of the machinery as valued by plaintiff in its rendition of its property to the assessor. In estimating the cost of filling, he gives no figures as to the cost of such work in the past.

Mr. Ingalls' plan and principles for valuation are sound in theory, and are probably the best that could be devised as a basis for a sale. One purchasing or selling mining property must look far ahead, and anticipate future events and conditions, and this he must do at his peril, as the price, once fixed and paid, is final. But in the assessment for taxation of such properties the situation is different. The assessor is guided by conditions as they exist at the time of the assessment, and is not required to hazard an opinion on future prices and cost of production which might increase or decrease the value of the property. Assessments are made annually, so from year to year they may be raised or lowered as new conditions may warrant.

The Hoover system, it seems, has been adopted, for the purpose of assessment, by two states only, Michigan and Minnesota, and in these states for iron mines alone, not for copper and other mines. The usual method of assessment for mining properties is on the basis of the market value of the stock. Such method cannot be applied in the case at bar, for the reason that none of the stock has recently been sold or quoted on the market. Even though the method be entirely applicable and feasible in the appraisement of property for taxation, there is a wide latitude for variance in the estimate of future prices, cost of production and profits, especially where the time is to cover 22 years.

The plan adopted by the Louisiana tax authorities is in force in Arizona. It is by no means perfect, in fact, if applied to a mine in which the ore was almost exhausted, it would work a great injustice. The greater the past production and consequent profits of a mine, the less may be expected in future aggregate production and profits, as, in the language of Mr. Ingalls, a mine is a wasting asset. Such past production and profits, however, do afford a fair basis for the estimate of future annual production and profits up to the exhaustion of the mine, subject, of course, to such changing conditions as may be foreseen.

There is not, after all, a great difference between the application of the methods of the state board and those applied by Mr. Ingalls. Both capitalize earnings—the board, past earnings, which may be a basis for estimating future earnings; Ingalls, future earnings, estimated on his own conclusions as to future conditions. The board figured on the basis of 15 per cent. capitalization; Ingalls, on only 14 per cent. net earnings. The board, however, did not include any percentage for a sinking fund to take care of the principal. Ingalls included 3½ per cent., making a total of 17½ per cent., or 2½ per cent. more than that of the board. At the time the assessment was made, the contents of the mine had not been definitely determined, though the board did have the estimate of the Channing Commission, which, however, is shown to have been a million tons short of the real contents of the mine as estimated by Ingalls. The board, therefore, was not in position, at that time, to estimate accurately the life of the mine, and to make the proper allowance for a return of present value. It may be that the assessment of 1919 should not have been the same as in 1918, after the extraction of 918,700 tons of sulphur, for which no allowance was made; but it likewise may be that the 1918 assessment was too low, rather than that the 1919 assessment was too high.

The court is more interested in results than in methods. If there were a substantial agreement between the state's figures and Ingalls' as to prices and cost of production, there would not be a very material difference in the capitalization. The question for the court to determine is: Was plaintiff's property overvalued in the light of conditions—not as they now exist—but as they existed on January 1, 1919? At the time of the assessment, the record showed that the mine had produced during the past 11 years, nearly 5,000,000 tons of sulphur, yielding a profit of over $55,500,000. With over 4,500,000 tons still in the ground, Mr. Ingalls' valuation of the mine at $4,000,000 places future

promise in glaring disproportion to past performance. Furthermore, that valuation does not square with plaintiff's action in claiming and receiving, in settlement of its income tax with the federal government, a depletion allowance of $2.80 for each ton of sulphur taken from the mine. At this rate, the sulphur in the mine would be worth, in round figures, $11,700,000, which, with the value of the machinery, would aggregate a figure in excess of $12,000,000 as against the $4,000,000 now urged as a fair assessment for the property.

[2] Under well-settled jurisprudence, both state and federal, the assessment appealed from is presumed to be correct. Pons v. Board of Assessors, 118 La. 1101, 43 South. 891; Sunday Lake Iron Co., v. Wakefield Tp., 247 U. S. 350, 38 Sup. Ct. 495, 62 L. Ed. 1154. The rule is thus well expressed in Judson on Taxation, p. 739:

"The burden of proof which devolves upon the actor in all litigation is emphasized in tax litigation; that is, in litigation involving the legality of taxation, in that the litigant must overcome the presumption that assumes the validity of the exercise of legislative power and the further presumption when acts of taxing officers are complained of, that such officers do not violate their sworn duty."

[3] Plaintiff's evidence, I think, fails to establish as against this presumption, the contention that its assessment exceeds the real value of its property; but it is urged that there has been a discrimination against plaintiff—that other property in the state of the same class is not assessed at its full value. This charge is leveled particularly at the assessment of oil lands and of agricultural lands.

Oil wells are bored in a manner similar to those of the sulphur mine, but there is this important difference in the two minerals. The sulphur deposit is in solid form, and its location, therefore, fixed; whereas, oil is a liquid, and of a fugitive character, consequently it is impossible to estimate the amount of oil under any given area, as was estimated the amount of sulphur in the mine. Oil lands could not, therefore, be assessed by the Hoover method. It is contended, however, that the same methods which were applied to oil lands might have been used in the assessment of the sulphur mine, and, if they had been, the assessment would have been, in round figures, only $5,500,000. The rule adopted for the valuation of oil lands is to multiply the average daily production for the first month of the year by the value of 100 barrels of oil on the 1st day of January. No reason is given for such a rule, but it is stated that it is used in buying and selling oil lands. As a result of assessment under this rule, the total assessment of all of the oil lands of the state aggregated only $3,362,848 in 1918, and $5,689,182 in 1919, although the report of the Department of Conservation shows that such lands produced, in round figures, 17,300,000 barrels of oil in each of those years. If $1.50 per barrel, which seems to be a fair average, be taken as the value, such annual production of oil was worth approximately $25,000,000. Clearly these lands are worth more than this small fractional part of the value of the oil taken from them; but it is impossible to say at just what percentage of their real cash value they were assessed.

To prove the contention that the agricultural lands of the state were undervalued, the plaintiff employed Mr. Zack B. Broussard, formerly an inspector for the State Board of Affairs, to have prepared under his supervision lists and tables showing the sale of all such lands, not including judicial sales, in all of the parishes of the state during the years 1918 and 1919. Agricultural lands are divided by the board for assessment into three classes, the minimum value of each class being fixed by the board for the guidance of the local assessor. A comparison of the assessment of such lands with the price they brought at sale shows that the lands in 1918 were assessed at only 71 per cent. of such selling price, and for the year 1919 at only 64 per cent. The sales in the lists and tables included credit sales, as well as cash sales, so that they do not necessarily reflect the actual cash value. The evidence is such, however, as to convince the court that these lands are not assessed at their full cash value, though the percentage may be considerably higher than that figured on all sales, both cash and credit. No evidence was offered as to undervaluation of any other class of property.

[4] In a suit for reduction of assessment, it is not sufficient to prove merely the undervaluation of certain other classes of property. Such undervaluation must be intentional and habitual. State of New York v. Barker, 179 U. S. 284, 21 Sup. Ct. 121, 45 L. Ed. 190. The whole subject is fully reviewed in Greene v. Louisville & Interurban R. R. Co., 244 U. S. 499, 37 Sup. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88. That case involved the assessment of the franchise of the defendant company at its full value, whereas all other property in the state was valued on a 60 per cent. basis; such undervaluation having been intentional, systematic, and persistent. The Supreme Court sustained the lower court in its decree enjoining the collection of the excess portion of the tax on an assessment based on a higher percentage of real value than that on which other property was assessed. The court said:

"It is equally plain that it makes no difference what basis of valuation— that is, what percentage of full value—may be adopted, provided it be applied to all alike. The adoption of full value has no different effect in distributing the burden than would be gained by adopting 75 per cent., or 50 per cent., or even 10 per cent., as the basis—so long as either was applied uniformly. The only difference would be that, supposing the requirements of the treasury remained constant, the rate of taxation would have to be increased as the percentage of valuation was reduced. (Under section 171 of the Constitution, the rate of taxation may be varied by the General Assembly from year to year, according to requirements.) Therefore the principal, if not the sole, reason for adopting 'fair cash value' as the standard for valuations, is as a convenient means to an end—the end being equal taxation. But if the standard be systematically departed from with respect to certain classes of property, while applied as to other property, it does not serve, but frustrates, the very object it was designed to accomplish. It follows that the duty to assess at full value cannot be supreme in all cases, but must yield where necessary to avoid defeating its own purpose."

It will be noted that the decree was based on the fact that the discrimination was intentional, systematic, and persistent. In the more recent case of Sunday Lake Iron Co. v. Wakefield, 247 U. S. 352, 38 Sup. Ct. 495, 62 L. Ed. 1154, the court held that, while the plain-

tiff's mine was assessed relatively higher than other lands within the county, although the statute enjoined the same rule for all, it was unable to conclude that the evidence established that the state board entertained any purpose or design to discriminate, or that its action was not incompatible with an honest effort, in new and difficult circumstances, to adopt valuations not relatively unjust or unequal.

While recognizing the principle that intentional, systematic undervaluation by state officials of other taxable property contravenes the constitutional rights of one taxed upon the full value of his property, citing Raymond v. Chicago Union Traction Co., 207 U. S. 20, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757, the court added:

"It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party. Head Money Cases, 112 U. S. 580, 595; Pittsburgh & Ry. Co. v. Backus, 154 U. S. 421, 435; Maish v. Arizona, 164 U. S. 599, 611; Adams Express Co. v. Ohio, 165 U. S. 194, 229; New York State v. Barker, 179 U. S. 279, 284, 285; Coulter v. Louisville & Nashville R. R. Co., 196 U. S. 599, 608; Chicago, Burlington & Quincy Ry. Co. v. Babcock, 204 U. S. 585, 597."

[5] The State Board of Affairs, in passing on the appeal in plaintiff's case, finally assessed the property in accordance with the system then in effect in Arizona, and according to the same rules by which the two salt mines in the state were assessed, the only two other properties exactly in the same class. The members, themselves, of the state board, denied any intention to discriminate against plaintiff, and the evidence of Mr. Broussard, who was in its employ until 1919, is, in effect, that when he was first employed, property was assessed on a basis of 50 per cent. of its value, but that it had been the honest effort of the board to list all property at 100 per cent.

"Q. Has it not been the honest effort of the Board of State Affairs, since its organization, and especialy at the time you were employed by the board, to list all property in Louisiana at its cash value? A. Surely it had; that was my understanding when I worked for the board. * * *

"Q. You don't know, Mr. Broussard, how much increase has been made by the Board of State Affairs in the valuation of all property in Louisiana, since that board was organized, do you? A. There was a considerable increase, Mr. Sneed; but I don't know the exact figures.

"Q. It has a great deal more than doubled in three years, has it not? A. Yes, sir; there was a multiple of increase, but I don't remember it.

"Q. But all property—everything went up? A. Everything went up.

"Q. It is more than double? A. More than double; possibly merchandise class of property was more than trebled.

"Q. And produce went way up? A. Yes, sir.

"Q. In other words, the Board of State Affairs has made a constant, earnest, and uninterrupted and continued effort to get all property in Louisiana assessed at its actual cash value? A. They certainly have."

Referring to the fact that Mr. Broussard was assessor of his parish from 1909 to 1912, he was asked at what proportion of its cash value the property was carried on the assessment rolls, and replied 33⅓ per cent. Asked how it was now carried on those rolls, he replied: "I think they call it 100 per cent."

Until recently no serious effort was made to comply with the constitutional provision that all property should be assessed at its full cash value. Throughout the state there was gross inequality and lack of uniformity, resulting from the varying standards of the different assessors. The task of raising all assessments to a 100 per cent. basis, and thus securing that equality and uniformity which is the purpose of that provision of the Constitution, is, indeed, a difficult one, and one which requires time and persistence on the part of the assessing authorities, and patience and forbearance on the part of the assessed.

If an honest effort is now being made by the Board of Affairs to place the assessment of all property in the state on a 100 per cent, cash value basis, as stated by Mr. Broussard, who is in a position to know, and for whose veracity plaintiff vouches, the court should hesitate long before undoing its partially completed work. Such action on the part of the court could only be warranted where the evidence clearly showed that the board was in bad faith; that it was not making a bona fide effort to assess all property at its full value, but, while assessing plaintiff's property on that basis, was intentionally, systematically, and persistently undervaluing all other property, or at least the greater portion of all other property.

The evidence shows, at most, but a small proportion of the total property of the state to be underassessed, and fails to show any property of the same class as that of plaintiff to be undervalued. If the great mass of the property in the state is now assessed at is full value—and there is no evidence to the contrary—the board has made good progress during the brief time which has elapsed since its creation in 1916. The court will expect that such inequalities in assessment as have been shown to exist by the evidence in the trial of this case will be corrected as promptly as circumstances will permit.

A decree will be entered, rejecting plaintiff's demands