## LIBERTY CENT. TRUST CO. et al. v. GILLILAND OIL CO.

(District Court, W. D. Louisiana. February 4, 1922.)

No. 133.

**Receivers ⬅153—Required to pay license tax of corporation.**

The Severance License Tax Law of Louisiana, requiring, inter alia, the payment by each person, firm, corporation, or association of a license tax of 2 per cent. on the value of oil taken from land in the state, *held* intended to apply, not only to corporations, but also to receivers of solvent corporations, and a federal court of equity, which, through its receivers, is profitably conducting the business of an oil company, should in justice to the state, whose natural resources are depleted thereby, require its receivers to pay such tax, whether or not it might legally avoid such payment.

In Equity. Suit by the Liberty Central Trust Company and others against the Gilliland Oil Company. On rule of W. N. McFarland, Supervisor of Public Accounts, and J. W. Coleman, Tax Collector for the Parish of Claiborne, on receivers to show cause why they should not comply with the provisions of the Severance License Tax Law of Louisiana and pay the tax therein provided. Receivers instructed to make payment.

W. M. Phillips, of Shreveport, La., for plaintiff in rule.

Wise, Randolph, Rendall & Freyer, of Shreveport, La., for receivers.

JACK, District Judge. The Gilliland Oil Company was one of the largest operators engaged in the production of oil in North Louisiana. The receivers are successfully continuing the work of the corporation, drawing oil from the old wells and bringing in new ones, aggregating a total production in Louisiana of about 15,000 barrels of oil per day.

This rule was taken on the receivers by W. N. McFarland, supervisor of public accounts, and J. W. Coleman, tax collector for the parish of Claiborne, to show cause why they should not, in compliance with the "Severance License Tax Law, being Act 31 of the General Assembly of Louisiana of 1920," file with the proper officers of the state the reports of the oil produced, as required by section 2 of said act, and why they should not pay the 2 per cent. tax levied on the value of such oil when severed from the soil.

There is no real issue of fact made in the answer, the denials of the various allegations of the petition being denials of conclusions of law; consequently, no evidence was taken, but the case argued and submitted on the petition and answer, and on motion to dismiss on the ground that the facts alleged do not constitute a valid cause of action.

In brief, the defense is that receivers appointed by a court are not included within the statute, and, in the alternative, that, if the statute be so construed as to include receivers appointed by a federal court, it is unconstitutional, being an attempt to levy a tax or license against the judicial department of the government in the exercise of its function of administering property under its control. The act provides:

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"That there is hereby levied a license tax for the year 1920 and for each subsequent year upon each person, firm, corporation or association of persons engaged in the business of severing natural resources from the soil or water; including all forms of * * * minerals, such as oil, gas, sulphur, salt, coal and ores."

It is not disputed that the Gilliland Oil Company, prior to the appointment of receivers, was subject to the tax, but it is contended that, while the act covers corporations, it does not cover receivers of corporations because not specifically enumerated. I think this is too narrow a view—though not without authority—and that the Legislature intended the act to cover, not only corporations, but likewise the receivers of such corporations; that they are "persons" within the intent of the law.

Able and industrious counsel for the receivers have, with much pains, cited the leading cases in support of their contention, and, likewise, those holding to the contrary. In Ohio v. Harris, 229 Fed. 892, 144 C. C. A. 174, the Circuit Court of Appeals for the Sixth Circuit held that the Ohio statute providing for the payment of a franchise tax was not applicable to receivers of an insolvent corporation. The court quoted from Commonwealth v. Lancaster Savings Bank, 123 Mass. 493, 496:

"Being a tax upon the privilege of transacting a particular business, it would seem necessarily to follow that if, at the time when the tax is to be assessed and is declared to accrue, the corporation has for the purpose of transacting its business practically ceased to exist and can no longer enjoy the privilege, then no tax is to be exacted."

Again, in the case of Scott v. Western Pacific Railway Co., 246 Fed. 545, 158 C. C. A. 515, it was held that the receivers of an insolvent railway corporation were not liable for income tax under the Act of October 3, 1913, 38 Stat. at Large, 166, the court holding that the omission in the act to include property held by receivers was intentional.

Again, in Pennsylvania Steel Co. v. New York City Railway Co. (D. C.) 193 Fed. 286, it was held that an incorporation tax, under the Tariff Act of August 5, 1909 (U. S. Compiled Statutes Supp. 1909, p. 844), did not apply to receivers of an insolvent corporation. The Court of Appeals for the Second Circuit, in affirming the decision, held that the special excise tax provided by the act was imposed upon doing business in a corporate capacity, citing Flint v. Stone Tracey Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312, and Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428. The decision of the Court of Appeals was affirmed by the Supreme Court in United States v. Whitridge, 231 U. S. 144, 34 Sup. Ct. 24, 58 L. Ed. 159, the court holding that the language of the act does not, in terms, impose a tax upon the income arising from the conduct of business unless it be carried on by the corporation, and the court was "unable to perceive that such receivers are within the spirit and purpose of the act, any more than they are within its letter."

In Bright v. State of Arkansas, 249 Fed. 950, 162 C. C. A. 148, the Circuit Court of Appeals for the Eighth Circuit, in holding the receivers of a railway corporation liable for a tax levied on corporations for

the privilege of exercising their franchise, reviews the jurisprudence on this subject, including the case of United States v. Whitridge and Coy v. Title Guaranty & Trust Company, 220 Fed. 90, 135 C. C. A. 658, L. R. A. 1915E, 211, by the Circuit Court of Appeals for the Ninth Circuit, and holds in line with the latter case, that—

"by the great weight of modern authority, * * * courts of equity, operating the property and liquidating the debts of corporations, which would otherwise have been liable to pay such taxes, ought to direct the payment by their receivers of such taxes as would have accrued during the time the receivers were actually operating the property."

It is not necessary to base the opinion in this case on the seeming weight of authority, for the case is easily distinguishable from those cited in which the receivers were held not liable for a tax for the privilege of doing business. While it is true that the tax levied by the Louisiana statute is termed a "license tax," it is not merely a license to do business, but it is a license tax to engage in a particular form of business which, while it develops, eventually depletes, the state's resources. It is, consequently, in the nature of a property tax, being perhaps the only practical way yet devised by which there can be levied on those engaged in the production of mineral oil their just share of the burdens of taxation.

In the case of Union Sulphur Co. v. Reid, Sheriff and Tax Collector, 271 Fed. 978, this court recently had occasion to comment on the undervaluation in assessment of the oil lands of the state:

"The rule adopted for the valuation of oil lands is to multiply the average daily production for the first month of the year by the value of 100 barrels of oil on the 1st day of January. No reason is given for such a rule, but it is stated that it is used in buying and selling oil lands. As a result of assessment under this rule, the total assessment of all of the oil lands of the state aggregated only $3,362,848 in 1918 and $5,689,182 in 1919, although the report of the Department of Conservation shows that such lands produced in round figures 17,300,000 barrels of oil in each of those years. If $1.50 per barrel, which seems to be a fair average, be taken as the value, such annual production of oil was worth approximately $25,000,000. Clearly these lands are worth more than this small fractional part of the value of the oil taken from them; but it is impossible to say at just what percentage of their real cash value they were assessed."

Though not mentioned in the opinion, the evidence showed in that case that oil leases were not assessed and taxed, the entire tax falling on the land. While the Severance Tax is not in lieu of all property taxes, it offers, to its limited extent, a fair and equitable manner of taxing such property which has proven alike acceptable to the state on the one hand, and to the landowners and their lessees, the operating companies, on the other.

This case, then, is not analogous to those cited in which it was held that the receivers were not liable for a tax imposed solely on the right to do business. The doing of business by the corporation, and its continuance by the receivers in such cases, took nothing from the natural resources of the state.

The Gilliland Oil Company, as far as the record shows, is not insolvent. Its business is now being ably carried on by the receivers.

A very large quantity of oil is being daily severed from the soil. The receivers do not represent the corporation, but they represent the court in the administration of the company's properties for the benefit of its creditors, and for the eventual benefit of its stockholders. The failure to pay such severance tax would inure to the benefit of such stockholders, yet there is no good reason why they should fare any better than the stockholders of a corporation being administered by its own directors, or why the creditors of such corporation should fare any better than the creditors of a corporation administering its own affairs.

The oil is being taken from the soil. It cannot be replaced. Whether the tax be, by its terms, on the oil itself, or on the privilege of severing it from the soil, the effect is the same. The purpose of the act is to give to the state two per cent. of the value of all oil so taken, and the wording of the statute is immaterial. The business of the corporation is being conducted, and profitably conducted, by the court, which acts through its receivers, and a court of equity, even though it have the legal right to do so, should not avoid a just and equitable obligation to the state.

The demand for penalties and attorney's fees will be denied. The receivers properly refused to make payment until the matter had been submitted for the instructions of the court. A decree will be prepared and entered in accordance with the views herein expressed.