680 F.2d 1131
 6 Collier Bankr.Cas.2d 972, 9 Bankr.Ct.Dec. 140,
Bankr. L. Rep. P 68,700
 In the Matter of Scott Reynolds SULLIVAN, Debtor-Appellant.
United States of America, Intervening-Appellee.
In re Willis Wayne WEST, Debtor-Appellant.
State of Illinois, Intervening-Appellee.
 Nos. 81-1921, 81-2374.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 16, 1982.
Decided May 19, 1982.
 
 Vern Countryman, Harvard Law School, Cambridge, Mass., for debtors-appellants.
 Thomas W. B. Porter, Dept. of Justice, Civ. Div., Washington, D. C., intervening-appellees.
 Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BAUER, Circuit Judge.
 PELL, Circuit Judge.
 
 
 1
 In these consolidated appeals, which present issues of first impression at the level of this court, the appellants challenge the constitutionality of section 522(b)(1) of the Bankruptcy Code of 1978, 11 U.S.C. § 522(b)(1) (Supp. IV 1980) (Code). Section 522(b)(1) permits a State to "opt out" of the scheme of federal exemptions enumerated in section 522(d). The debtors-appellants urge that the opt-out section violates the constitutional provision that empowers Congress "to establish uniform Laws on the subject of Bankruptcies." U.S.Const. art. I, § 8, cl. 4. Secondly, they maintain that section 522(b)(1) unconstitutionally delegates Congressional power to the states.[1]
 
 
 2
 After outlining the exemption provisions under both the federal scheme and Illinois law, we will discuss each of the appellants' arguments. We will discuss separately those cases cited by the appellants that have applied a preemption analysis because this line of reasoning has relevance to both the uniformity and delegation issues.
 
 I. FACTS
 
 3
 We need recite few facts pertaining to the debtors for purposes of this appeal. Each debtor is a resident of the State of Illinois. Each filed a voluntary petition in 1981 under Chapter 7 of the Bankruptcy Code, claiming the federal exemptions enumerated in section 522(d), 11 U.S.C. § 522(d) (Supp. IV 1980).[2] In both cases, the bankruptcy judges sustained objections by the trustees to the debtors' reliance on the section 522(d) exemptions. 11 B.R. 432. West then appealed to the United States District Court, which affirmed without opinion the decision of the Bankruptcy Court. Sullivan appealed directly to this court.[3]
 
 II. STATUTORY EXEMPTIONS
 A. Federal
 
 4
 Section 522(d) specifies the property that is subject to exclusion under subsection 522(b)(1). The exemptions apply without regard to marital status[4] or whether the debtor has dependents. The statute provides a generally unlimited exemption for unmatured life insurance contracts, health aids, social security, alimony, and various other items of income as well as the right to receive an award under a crime victim's reparation law. §§ 522(d)(7), (9), (10), and (11)(A). Subsections 522(d)(11)(B) and (11)(E) further allow payments due the debtor by virtue of a wrongful death or in compensation of lost or future earnings to the extent reasonably necessary for the support of the debtor and any of his dependents. Limited exemptions are provided for the loan value of an unmatured life insurance contract and payments for personal injuries, §§ 522(d)(8) and 11(D). Limited exemptions for the debtor's interest in a motor vehicle, household items, jewelry, and professional books or tools of the trade are also included. §§ 522(d)(2), (3), (4), and (6). Two exemptions of extreme importance to a debtor are the homestead provision and what is frequently termed the "wild card" exemption. These provide:
 
 
 5
 (1) The debtor's aggregate interest, not to exceed $7,500 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence, in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial plot for the debtor or a dependent of the debtor.
 
 
 6
 and
 
 
 7
 (5) the debtor's aggregate interest, not to exceed in value $400 plus any unused amount of the exemption provided under paragraph (1) of this subsection, in any property.
 
 
 8
 §§ 522(d)(1) and (5).
 
 
 9
 Section 522(b), however, provides that the State may make these federal exemptions inapplicable to its debtors:(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate either-
 
 
 10
 (1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; ....
 
 
 11
 § 522(b)(1) (emphasis added).
 
 B. Illinois
 
 12
 In 1980, Illinois Public Act 81-1505 was enacted.[5] This Act specifically prohibits Illinois residents from claiming the schedule of exemptions provided in section 522(d). The Act took effect on January 1, 1981, and therefore is pertinent to the petitions of both debtors. The exemptions to which a debtor is entitled under Illinois law are found primarily in chapter 52 of the Illinois Revised Statutes of 1979. There is a homestead exemption entitling "(e)very householder having a family ... to the extent in value of $10,000 ... (if) occupied by him or her as a residence." Ill.Rev.Stat. ch. 52, § 1 (1979).[6] Section 13 provides that the following personal property is exempt: items such as necessary wearing apparel, a bible, and school books; and payment received as a result of military service for a period of one year; $300 worth of property including wages and salary due the debtor (an additional $700 is allowed a debtor who is the head of a family); and any money due the debtor from the sale of personal property that would have been exempt had it been retained by the debtor. Id. ch. 52, § 13. Other chapters of the Illinois statutes permit exemptions for proceeds from various insurance policies, id. ch. 73, § 850, workers compensation benefits, id. ch. 48, § 138.21, and unemployment benefits, id. ch. 48, § 540.
 
 C. Comparison
 
 13
 We have detailed the statutory exemptions under federal and Illinois law at some length to illustrate that there is indeed a marked contrast between the property which a debtor is permitted to declare exempt under the two schemes. The contrast is most marked in the case of an unmarried debtor with no dependents. The federal homestead and "wild card" provisions, §§ 522(d)(1) and (5), permit such a debtor to exempt $7900 whereas his allowance under Illinois law would be $300. See Ill.Rev.Stat. ch. 52, § 13 (1979).
 
 III. UNIFORMITY
 
 14
 The United States Constitution provides that Congress may "establish uniform Laws on the subject of Bankruptcies." U.S.Const. art. I, § 8, cl. 4. One interpretation of the term "uniform" would mandate that the bankruptcy law, including the permissible exemptions, be identical in the fifty states. One commentator has labeled this interpretation "true uniformity," Bankruptcy Exemptions: Whether Illinois's Use of the Federal 'Opt Out' Provision Is Constitutional, 1981 S.Ill.U.L.J. 65, 72. In a limited sense, section 522 meets the test of true uniformity because the opt-out provision is applicable to each State. True uniformity as to individual debtors clearly does not exist, however, because the opt-out provision allows exemption levels to differ among the states.
 
 
 15
 Another interpretation of the term "uniform," articulated by the Supreme Court, requires only "geographical uniformity." E.g., Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902); Fairbank v. United States, 181 U.S. 283, 298, 21 S.Ct. 648, 654, 45 L.Ed. 862 (1901); Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969 (1900); Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). The Moyses Court applied the concept of geographical uniformity in upholding the Bankruptcy Act of 1898, 30 Stat. 544 (1898) (repealed 1978) (1898 Act). That Act originally provided:
 
 
 16
 This Act shall not affect the allowance to bankrupts of their exemptions which are prescribed by the State laws in force at the time of the filing of the petition in the State wherein they have had their domicile for the six months or the greater part thereof immediately preceding the filing of the petition.
 
 
 17
 30 Stat. 548.[7] Faced with a challenge to the uniformity of the Act's exemption provision, the Supreme Court stated that "uniformity is geographical, and not personal, and we do not think that the provision of the Act of 1898 as to exemptions is incompatible with that rule." 186 U.S. at 188, 22 S.Ct. at 860.
 
 
 18
 The debtors urge that Moyses is not applicable to the case at bar. Their arguments fall into two categories: (1) Moyses was incorrectly decided, and there is an indication that the Supreme Court has in recent years retreated from the concept of geographical uniformity in bankruptcy cases; and (2) the new Bankruptcy Code differs significantly from the 1898 Act discussed in Moyses and those differences make the Moyses decision inapposite.
 
 
 19
 First, we will outline the arguments posed by the debtors in support of their contention that the Moyses Court reached an incorrect result. The concept of geographical uniformity first emerged in tax cases. E.g., Fairbank v. United States, 181 U.S. 283, 298, 21 S.Ct. 648, 654, 45 L.Ed. 862 (1901); Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969 (1900); Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). Geographical uniformity was appropriate to those cases because there was a demonstrated intent on the part of the Constitution's framers to avoid discrimination among the states. See 181 U.S. at 298, 21 S.Ct. at 654; 178 U.S. at 106, 20 S.Ct. at 772. Arguably the uniformity provision relating to bankruptcies had a different focus: to eliminate discrimination among debtors. In Moyses, Chief Justice Fuller did not discuss this possible distinction; in fact, he did not cite any of the earlier tax decisions that had first articulated the concept of geographical uniformity.
 
 
 20
 Instead, the Moyses opinion relied on two lower court decisions which arose under the earlier Bankruptcy Act of 1867: In re Deckert, 7 Fed.Cas. 343, 344 (No. 3,728 C.C.E.D. Va. 1874), and In re Beckerford, 3 Fed.Cas. 26 (No. 1,209 C.C.D. Mo. 1870). The 1867 Act was, however, different in an important respect from the 1898 Act. The 1867 Act provided a uniform allowance of federal exemptions to debtors and, in addition, provided that the debtor might exclude from the bankruptcy estate whatever property his state designated as exempt from execution by creditors. The state exemptions recognized under the 1867 Act were those in force in 1864. Essentially, the 1867 Act provided a federal minimum and, additionally, ratified as federal law other state exemptions then in force. Although there were uniformity challenges to the 1867 Act, the issue was never resolved by the Supreme Court.
 
 
 21
 The Moyses Court relied on Deckert and Beckerford without discussing the differences between the 1867 Act and the 1898 Act and without acknowledging that the uniformity challenges to the earlier Act had never been fully resolved by the Supreme Court. See 186 U.S. at 189, 22 S.Ct. at 861.
 
 
 22
 Although the arguments posed by the debtors regarding the correctness of the Moyses decision are forceful, this court obviously lacks the authority to overrule a Supreme Court case. Further, we are not convinced that recent Supreme Court authority has indicated a retreat from the Moyses rule. In the Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Court upheld the validity of the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701-794 (Supp. III 1979), on the ground, inter alia, that it was consistent with the geographical uniformity rule of Moyses. 419 U.S. at 158-61, 95 S.Ct. at 365-67. Even more recently, in Railway Labor Executives' Association v. Gibbons, --- U.S. ----, ----, 102 S.Ct. 1169, 1176, 71 L.Ed.2d 335 (1982), the Court cited Moyses for the proposition that "Congress can give effect to the allowance of exemptions prescribed by state law without violating the uniformity requirement." We do not share the appellants' view that the Supreme Court might well decide Moyses differently if that case were argued today.
 
 
 23
 By acknowledging that Moyses requires only geographical uniformity rather than "true uniformity," one can readily distinguish Nemetz v. INS, 647 F.2d 432 (4th Cir. 1981), on which the appellants rely. In Nemetz, the Fourth Circuit held that the INS could not determine whether an alien was a person of good moral character, and thus eligible for naturalization, by reference to state law.[8] The INS had argued that "Congress has traditionally deferred to the states to set standards in matters pertaining to public morality, and that the immigration laws contemplate such deference." Id. at 435. The court rejected this argument because the effect of relying on state law was inconsistent with the uniformity requirement demanded by the naturalization clause.
 
 
 24
 Nemetz is distinguishable from the instant case in several respects. The most critical is that the naturalization clause has not been interpreted as requiring only geographical uniformity. To argue that Nemetz is apposite to the case at bar is essentially to assert that the rule in bankruptcy cases should be a requirement of "true uniformity." Whatever merit this argument might have, we think that it is foreclosed, at least as to the 1898 Act, by Moyses.
 
 
 25
 There remains, however, the argument that the Moyses rule is inapplicable to the Code because of the detailed exemption provisions of section 522(d). In contrast to the Code, the 1898 Act provided no schedule of federal exemptions. The appellants find this difference relevant in essentially three ways.
 
 
 26
 First, the debtors urge that the holding in Moyses might reflect the Supreme Court's realization that debtors would arguably have been left with no exemptions if the reliance of the 1898 Act on state exemptions were held unconstitutional. Invalidating section 522(b)(1) would not have such an effect because of the exemption schedule provided in section 522(d). We are not persuaded by this argument. Although the appellants' factual observations about the two statutes are correct, we are not willing to ascribe to the Moyses Court a line of reasoning that is nowhere reflected in that opinion.
 
 
 27
 Second, the debtors assert that Congress enacted the Code because it found many state exemption laws to be "hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors." H.R.Rep.No.95-595, 95th Cong., 1st Sess. 126 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6087. The generous exemption provisions of section 522(d) were an effort to remedy this situation. This argument raises the question of Congressional intent.
 
 
 28
 We find the legislative evolution of the Code extremely important. The bill introduced in the Senate proposed allowing state law to govern exemptions as it had under the 1898 Act. See S.Rep.No.95-989, 95th Cong., 2d Sess. 6 (1978), reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5792. The House bill, by contrast, proposed allowing a bankrupt debtor to choose between state exemptions and enumerated federal exemptions. See H.R.Rep.No.95-595, 95th Cong., 1st Sess. 126-27 (1977), reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6087-88. The language of section 522(d) is parallel, for the most part, to the provisions regarding exemptions in the House bill. The opt-out provision, section 522(b)(1), for which there is virtually no legislative history, was added to section 522 as a compromise provision. See 124 Cong.Rec. S17,412 (daily ed. Oct. 6, 1978). We find from this history that the intention of providing a "fresh start" can be attributed only to the House. A resolve to let states determine the applicable exemptions must be attributed to the Senate. Congress did not resolve this difference. It settled on a "compromise" which in some cases may thwart the underlying purpose of the House. This court cannot seize upon the motivation of the House as representative of the entire Congress when the enacted legislation clearly warrants a contrary conclusion. We do not find, therefore, that the Congressional intent underlying the Code makes the Moyses rule inapposite to the instant case.
 
 
 29
 Third, the appellants rely on two cases which have found an impermissible conflict between state exemption laws and section 522(d). Because this is essentially a preemption argument, which has relevance to both the uniformity and delegation issues urged by the debtors, we discuss these cases separately.
 
 IV. PREEMPTION
 
 30
 In In re Rhodes, 14 B.R. 629, Bankr.L.Rep. (CCH) P 68,349 (M.D.Tenn.1981), the bankruptcy court invalidated the state's opt-out law.[9] The exemptions provided by Tennessee law included a "homestead" exemption applicable only to those who utilized the subject property as a "principal residence." As the bankruptcy court noted, this resulted in a discrimination between homeowners and non-homeowners. The court reasoned that "(i)n enacting (sections 522(d) (1) and (5) ) Congress rejected the antiquated homestead exemptions which many states provide homeowners with no corresponding relief for non-homeowners." Id. at p. 634. The court then stated that "(f)or a state to effectively opt its citizens out of § 522(d) it must provide a scheme of exemptions which is consistent with this policy." Id. Finding no way to construe the Tennessee exemption statutes so as to avoid such a conflict, the court held the State's law "opting out" of the federal scheme to be invalid.
 
 
 31
 We are not persuaded by the reasoning of the Rhodes court. First, as noted above, see Section III supra, it is not accurate to attribute the motivation of the House in proposing the section 522(d) exemptions to the Congress that eventually enacted the Code. The statute's treatment of exemptions reflects at the very least a mixed intention on the part of Congress. Second, and more significant, the Rhodes court is applying a preemption analysis to a situation in which Congress has specifically directed that a State can choose to declare section 522(d) inapplicable to its citizens. To apply a preemption analysis in this context is to ignore totally the explicit language of the section 522(b) (1) opt-out provision.
 
 
 32
 The other case applying a preemption analysis that is cited by the debtors is readily distinguishable from the instant case. In Cheeseman v. Nachman, 656 F.2d 60 (4th Cir. 1981), the Fourth Circuit considered the definition of "householder" pertinent to the Virginia exemption provisions, Va.Code § 34-1 (Supp.1980). The Virginia state courts had construed that term so as to preclude a husband and wife filing a joint bankruptcy petition from both claiming the homestead exemption available under Virginia law, id. § 34-4. The Cheeseman court held that such a limitation was impermissible. The Fourth Circuit relied on the Virginia policy of liberally construing the exemption provisions and the fact that the interpretation of the state courts, as adopted by the bankruptcy court, would encourage indebted couples to separate in order that each could claim the homestead exemption. Further, and most pertinent to the appellants' argument in the case at bar, the Fourth Circuit found an impermissible conflict between the narrow interpretation of "householder" and the provision of section 522(m) which states that the section 522 exemption provisions "shall apply separately with respect to each debtor in a joint case," § 522(m). The preemption analysis is arguably appropriate to this case because section 522(b)(1) gives the states only a limited power to nullify the effect of the Code. A state is specifically permitted to displace the exemption provisions of section 522(d); it is not, however, given the clear power to abrogate section 522(m).
 
 
 33
 In summary, however appropriate a preemption analysis might have been in Cheeseman, we think that it is not relevant to the issue presented by the present case. To say that state exemption provisions providing less solace to debtors than the federal exemptions of section 522(d) are in "conflict" with either the language of the Code or expressions of Congressional intent underlying it is simply inaccurate. If Congress has the power to permit states to set their own exemption levels, the Illinois provisions are constitutional.
 
 V. DELEGATION
 
 34
 The final argument urged by the debtors is that Congress lacks such power. They urge that section 522(b)(1) represents an impermissible delegation of Congressional power. The appellants overlook the long-established principle that the states retain the power to enact bankruptcy laws so long as they do not conflict with federal bankruptcy legislation. In Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 4 L.Ed. 529 (1819), Chief Justice Marshall stated:
 
 
 35
 (T)he power granted to congress may be exercised or declined, as the wisdom of that body shall decide. If in the opinion of congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that state legislation of the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states.
 
 
 36
 17 U.S. (4 Wheat.) at 195-96. Under Sturges, Illinois has the power to establish exemption provisions for bankrupts of that State so long as the state law does not conflict with the federal bankruptcy laws. As we noted in Section III, supra, there is no conflict between the Illinois exemption provisions and section 522(d) because of the express language of section 522(b)(1). Where a State is thus exercising its own power, no unconstitutional delegation of Congressional power can be found. See, e.g., Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 439-40, 66 S.Ct. 1142, 1160, 90 L.Ed. 1342 (1946).
 
 
 37
 Further, in Moyses, the Supreme Court held that the exemption provisions of the 1898 Act did not constitute an unconstitutional delegation. The Court stated: "Nor can we perceive in the matter of exemptions, priority of payments, and the like, any attempt by Congress to unlawfully delegate its legislative power." 186 U.S. at 190, 22 S.Ct. at 861. We find no distinction, relevant to the delegation argument, between the 1898 Act and the Code. Moyses, supported by the Sturges and Prudential opinions, persuades us that the debtors' delegation argument must fail.
 
 CONCLUSION
 
 38
 There is a marked discrepancy between the federal and Illinois exemption provisions. If the Constitution required federal bankruptcy laws to be "truly" uniform, this difference would be unconstitutional. The Supreme Court established in Moyses, however, that only geographic uniformity is required by the bankruptcy clause of the Constitution. We find no evidence that the Supreme Court has retreated from the Moyses rule or that the Code differs from the 1898 Act in such a way as to make Moyses inapposite. The Moyses Court also held that it was not an unconstitutional delegation of federal power for the federal bankruptcy laws to recognize state exemption laws. Accordingly, the judgments of the bankruptcy court in Sullivan and the district court in West are
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 In its "Statement of the Issues," Sullivan's brief also challenges section 522(b) and the Illinois exemption law on equal protection grounds. The equal protection argument is not further developed in either the opening or reply brief. We therefore deem it waived for purposes of this appeal. E.g., Chicago & W. Ind. R. R. Co. v. Motorship Buko Maru, 505 F.2d 579, 581 (7th Cir. 1974); see Fed.R.App.P. 28(a)(4)
 
 
 [2]
 Unless otherwise indicated, all statutory references are to the Bankruptcy Code, enacted pursuant to the Bankruptcy Reform Act of 1978, Pub.L.No.95-598, 92 Stat. 2549 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, and codified at 11 U.S.C. §§ 101-151326 (Supp. IV 1980)
 
 
 [3]
 Pursuant to 28 U.S.C. § 1293(b) (Supp. III 1979), the United States agreed to this direct appeal
 
 
 [4]
 Section 522(m) permits each spouse to claim the full exemptions if a joint petition has been filed
 
 
 [5]
 Illinois Public Act 81-1505 is codified as Ill.Rev.Stat. ch. 52, P 101 (Supp.1980)
 
 
 [6]
 The Illinois homestead exemption is not available to a debtor who does not provide a home for persons legally dependent upon him for support. Morris Investment Co. v. Skeldon, 399 Ill. 506, 78 N.E.2d 504 (1948)
 
 
 [7]
 The provision was amended by the Chandler Act of 1938, 52 Stat. 847 (1938) (repealed 1978) to read as follows:
 This Act shall not affect the allowance to bankrupts of the exemptions which are prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition in the State where they have had their domicile for the six months (or the greater portion thereof) immediately preceding the filing of the petition, or for a longer portion of such six months than in any other State ....
 We do not find that this amendment, cited without discussion by the appellants, alters our analysis.
 
 
 [8]
 Nemetz, an admitted homosexual, had committed sexual acts that were illegal under Virginia law
 
 
 [9]
 Other courts which have considered the issue raised in this appeal and in Rhodes have found section 522(b)(1) to be constitutional. See In re Lausch, 16 B.R. 162 (M.D.Fla.1981) (affirming 12 B.R. 55 (Bkrtcy.M.D.Fla.1981)); In re Curry, 5 B.R. 282 (Bkrtcy.N.D.Ohio 1980); In re Ambrose, 4 B.R. 395 (Bkrtcy.M.D.Ohio 1980)
 As noted previously, the instant cases represent the first time a court of appeals has ruled on the constitutionality of section 522(b)(1).